Richard A. FRENCH, Morris E. Dozier, Martin W. Bradberry, Henry C. Jennings, On behalf of themselves and all others similarly situated, Plaintiffs,

v.

Norman OWENS, Individually and in his capacity as Superintendent of the Indiana Reformatory; Cloid Schuler, In his capacity as Executive Director of the Adult Authority, Indiana Department of Correction; Gordon Faulkner, In his capacity as Commissioner of the Indiana Department of Correction, Defendants.

No. IP 75–677–C.

United States District Court,
S. D. Indiana,
Indianapolis Division.

May 7, 1982.

Donald R. Lundberg, Legal Services Organization, Indianapolis, Ind., Stephen A. Whinston, Charles Ory, Civ. Rights Div., Dept. of Justice, Washington, D. C., Sarah Evans Barker, U. S. Atty., Harold R. Bickham, Asst. U. S. Atty., Indianapolis, Ind., for plaintiffs.

Linley E. Pearson, Atty. Gen. of Ind., David Arthur, Deputy Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

This is a class action brought under 42 U.S.C. § 1983 by four inmates in the Indiana Reformatory at Pendleton, Indiana on behalf of all persons who are or will be confined in the Reformatory. The inmates allege that the conditions, rules, and practices at the Reformatory violate inmates' rights guaranteed by the United States Constitution and by the Indiana Constitution and laws of the state. The inmates seek to enjoin the responsible state officials from further violations.

The inmates complain of poor living conditions, inadequate medical care, lack of safety and security, bad food services, inadequate educational and vocational programs, an arbitrary system of prison discipline, and insufficient access to the courts. The inmates maintain that conditions at the Reformatory violate their right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment. The inmates also argue that the system of prison discipline and the access to legal materials fall short of the demands of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution. The inmates also insist that their right to equal protection found in the Fourteenth Amendment is violated because they are subject to harsher conditions and treatment than are inmates at the Indiana State Farm. Lastly, the inmates press a claim based on state law, arguing that they are being denied their right to rehabilitative and educational programs as guaranteed by Article I, § 18 of the Indiana Constitution and I.C. 1971, 11–1–1.1–26. Since the initiation of the action, the statute just mentioned has been repealed. However, it and other former sections of statute defining prisoners' rights have been replaced by various sections of P.L. 120 of the Acts of 1979 (hereafter P.L. 120), having to do with the Department of Correction. The 1979 Act is codified in I.C. 11–8–1–1 through 11–13–6–9; particular sections will be considered to the extent that the evidence may tend to show a violation thereof. Rule 15(b), F.R.Civ.P.

Jurisdiction over this case is based on 28 U.S.C. §§ 1343(3) and (4), which provide for the original jurisdiction of federal district courts in suits authorized by 42 U.S.C. § 1983. The inmates' request for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Jurisdiction over the state law claims is based on pendent jurisdiction.

### Procedural Background

This case began on November 21, 1975, when four inmates in the Indiana Reformatory filed a pro se complaint alleging that the conditions, rules, practices, and policies at the Reformatory were unconstitutional. This complaint was dismissed with leave to file an amended complaint.

On May 13, 1976, an amended class action complaint was filed, charging constitutional violations at the Reformatory. Plaintiffs' motion to maintain the suit as a class action was granted on December 20, 1977. The plaintiff class was defined as "all persons who are or may in the future be confined in the Indiana Reformatory, Pendleton, Indiana." The United States Government entered the case on March 10, 1978 when the Government was granted leave to participate as amicus curiae.

Trial began on July 5, 1978 and ended on August 14, 1978. Ruling was reserved pending submission of proposed findings of

fact and conclusions of law by both parties and filing of post-trial briefs. The cause was reopened for the taking of additional evidence March 1–5, 1982. The Court, in the presence of counsel, inspected the cellblocks, inside dormitories, kitchen, dining hall, visitors' room, and infirmary on March 5, 1982.

### General Principles

■ The Eighth Amendment to the Constitution of the United States prohibits cruel and unusual punishment and is applicable to the states through the Fourteenth Amendment. *Robinson v. State of California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). There is no precise definition of cruel and unusual punishment nor are there any mechanical standards to apply; rather, the Eighth Amendment embodies broad concepts of decency and humanity against which penal measures must be evaluated. Punishment must be made compatible with "evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1957).

The ban on cruel and unusual punishment was first used to check the use of torture and other physical abuse; however, the ban has developed into a means to prevent conditions which involve the unnecessary and wanton infliction of pain or go beyond present notions of decency. There is no iron curtain surrounding prisons. Prison confinement is a form of punishment subject to the stricture of the Eighth Amendment. See *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Newman v. Alabama*, 559 F.2d 283 (5 Cir. 1977); *Laaman v. Helgemoe*, 437 F.Supp. 269 (D.N.H.1977).

The shifting standard of what constitutes cruel and unusual punishment is not, however, an invitation to a federal court to create its vision of an ideal prison. As the Supreme Court pointed out in *Wolff v. McDonnell*, 418 U.S. 539, 561, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935, 954 (1974), prison is "a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." Lawful incarceration by definition involves withdrawal of some rights and privileges. The running of prisons involves complex and often contradictory objectives. Notions of punishment and rehabilitation mix with the need for safety and security. Courts must proceed cautiously in making an Eighth Amendment judgment. See *Rhodes v. Chapman, supra.*

However, the need for discretion does not mean no judicial oversight. "Courts certainly have a responsibility to scrutinize claims of cruel and unusual confinement and conditions in a number of prisons, especially older ones, have justly been described as 'deplorable' and 'sordid'. *Bell v. Wolfish*, 441 U.S. [520], at 562, 99 S.Ct. 1861 [at 1886], 60 L.Ed.2d 447." *Rhodes v. Chapman, supra.*

■ In determining whether the conditions at the Reformatory are cruel and unusual, each factor cannot be viewed separately. It is necessary to look at the totality of conditions in evaluating claims based on the Eighth Amendment. As the Court of Appeals for the Fifth Circuit explained in *Gates v. Collier*, 501 F.2d 1291 (5 Cir. 1974), in upholding a district court's determination of a violation of the ban on cruel and unusual punishment:

"Each factor separately, i.e., overcrowding dormitory barracks, lack of classification according to severity of offense, untrained inmates with weapons, lack of supervision by civilian guards, absence of a procedure for confiscation of weapons, may not rise to constitutional dimensions; however, the effect of the totality of these circumstances is the infliction of punishment on inmates violative of the Eighth Amendment, as determined by the trial court." 501 F.2d at 1309. See also *Williams v. Edwards*, 547 F.2d 1206 (5 Cir. 1977); *Johnson v. Levine*, 588 F.2d 1378 (4 Cir. 1978).

It is a familiar principle that where there are possibly dispositive state law claims

pendent to federal constitutional claims, the state claims will be dealt with first. *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Hillsborough v. Cromwell*, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909). This rule will be observed insofar as it is possible so to do.

### Findings of Fact

The Indiana Reformatory is a maximum security correctional facility housing adult male felons. It was built in 1923. The Reformatory proper is surrounded on three sides by high walls, with the fourth side enclosed by the cellhouse building. There are some buildings outside the walls, including a dormitory for inmates and a farm operation. The Reformatory has 35 acres within its walls and 1,900 acres in the entire institution; few inmates are permitted outside the walls.

The number of inmates housed in the Reformatory in August, 1978 was 1,215. By January 27, 1982 it had risen to 1,972.

### I. Housing

*"Every owner of an animal within the city shall see that his animal ... has proper ... shelter and ventilation, including quarters that are protected from excessive heat and cold and are of sufficient size to permit the animal to exercise and move about; such exercise enclosure shall be no smaller than twenty-four (24) square feet in area ..."* Sec. 6–7, Indianapolis Code (City of Indianapolis, Indiana).

Inmates are housed in three cellhouses and two dormitory buildings inside the walls, and one dormitory located outside the walls.

There are at present 297 usable cells in J cellhouse, 317 in H cellhouse, and 319 in G cellhouse. Each cellhouse consists of an inside cellblock in which two rows of cells on three tiers or floors are in the middle of the cellhouse, set back from the outside walls of the cellhouse. The cells are located back to back and are separated by a service area which runs the length of the cells and where wiring and plumbing are located. A row of cells on a particular tier is known as a range.

The cells in G and H cellhouses contain 44 square feet, and cells in J cellhouse contain 47.6 square feet. The cells have three solid walls and a barred front. Each cell contains a sink with cold running water, an uncovered toilet, one or two lockers, and one or two beds. The furniture and fixtures take up half the floor space. The back of each cell contains a 96 square inch grate with 12 to 15 holes in it, which is to serve as a ventilation duct. The grates are not cleaned and are clogged with dirt and lint.

The living quarters do not have adequate positive ventilation systems. The heat comes into the cellhouses in the lower part of the outside walls. There is no mechanism to disperse the heat to the cells. There is no summertime forced-air system to the cells. The cold and hot air systems are inadequate. For the most part the manipulation of the windows and the heating systems in the living quarters is the method of ventilation control. Many of the window opening and closing devices are defective. Consequently many windows must be sealed in the winter, disallowing any opportunity for manipulation when it is found necessary. The cells are too cold in winter and too hot in summer.

An attempt has been made in the cellhouses since 1978 to improve in-cell lighting. There have been considerable wiring alterations and fluorescent bulbs have been substituted for incandescent bulbs. Unfortunately this has not always resulted in improved lighting in the individual cells. In general, in-cell lighting is inadequate. Many, if not most, of the fluorescent fixtures, since initial issuance, have been replaced by incandescent bulbs of 40 or 60 watts. The result, no improvement. Many outside windows are dirty which diminishes the amount of natural light supplied to the cell and dormitory areas. Many cells have dark colored paint, have very dirty walls, walls practically covered with posters and

the like, all of which adversely affect the amount of light available to the inmate. Some light fixtures are in need of repair.

Many cells have toilet stools and sinks which, because of age and deterioration, are literally uncleanable. Many cells need paint. Many shower areas contain an accumulation of grime from the combination of water with detergents, and even have a noticeable mold growth. Cells are wet mopped only once a week, often without the benefit of cleaning materials. Showering is done daily by ranges, with 15 minutes being allowed for showering including travel time from the cell to and from the shower area, located at one end of the first floor of each cellhouse. Given the number of men using the showers at the same time and the number of showerheads, the time allowed is inadequate.

Defendants maintain a separate housing unit for inmates who are considered to require segregation from the general inmate population. This unit is known as administrative segregation or "A.S." This unit consists of 100 cells in two tiers, arranged back to back. There are 26 cells on the lower tier and 24 cells on the upper tier in each section. The cells have the same size, appearance, and furnishings as the cells in the cellhouses.

One side of administrative segregation is used for inmates sent to the unit as discipline for infractions of Reformatory rules. (The "DLU".) The other side of the two-tier cellblock is used to house three types of inmates: those who are confined in segregation for their own protection (self-lock-up), those who are under investigation for violating an institutional rule, and pretrial detainees transferred to the Reformatory (safekeepers).

The unit known as isolation or the maximum restraint unit ("MRU") is on the ground floor of the administrative segregation building. The MRU is used to provide even more secure confinement than disciplinary segregation. Each of the cells in isolation has a barred door which is covered with mesh which is flush with the wall of the cell. There is also a solid metal door which

has a 4″ × 6″ peephole as the only means of entrance of light. This door is controlled by the correctional officers and is shut at times as a means of disciplining inmates. One 40 watt light bulb is located above the door and is controlled by a switch located outside the cell. The toilet and lavatory fixtures are particularly scabrous.

In 1978 each of the cells had a single occupant. According to the "Master Plan" of the Department of Corrections, put in evidence at that time, the anticipated rise in prison population would be met by the construction of new facilities in both northern and southern Indiana. Indeed, the population at the Reformatory (1,215 on August 11, 1978) was to be reduced by 1981. Unfortunately, the Legislature has never funded the program, with the result that the population has zoomed to nearly 2,000 and doublecelling is rampant.

As of January 27, 1982, 310 of the 933 available cells in G, H and J cellhouses— 33%—had been converted to double cells by the addition of an extra bed and locker, and 26% of the 100 administrative segregation cells had likewise been so converted. This reduced the gross available space per man to less than 24 square feet, and the net space to approximately half this amount. The minimum amount of square feet per man thought to be necessary by the expert witnesses who testified, including defendants' experts, is 50 square feet. Considerably more may be required depending upon how much time per day the inmate is required to spend in his cell.

In the A.S. unit the cells have less height than those in the regular cellblocks, with the result that it is physically impossible for the doublecelled occupant of the upper bed to sit erect. There is no room in a double cell for a chair or stool, so unless the occupant of the upper bed has permission to sit on his cellmate's bed (frequently not granted) he cannot sit except upon the floor or the coverless toilet stool. It is only those in protective custody who have been double-celled, so that those who have committed no infraction of the rules are treated more harshly than those in the DLU.

Besides the cellhouses, inmates are housed in several dormitory units, two located inside the walls and one located outside the walls. One inside dormitory is referred to as the K dormitory complex and consists of six separate rooms on two floors. All rooms are double bunked, and nearly all bunks are occupied.

The sizes of the dormitories and number of bunks in each are:

K–1 – 3,134 square feet – 48 bunks

K–2 – 1,892 square feet – 30 bunks

K–3 – 2,509 square feet – 48 bunks

K–4 – 2,509 square feet – 48 bunks

K–5 – 7,988 square feet – 112 bunks

K–6 – 6,438 square feet – 96 bunks

A part of the area in each room in K dormitory is a common area where tables are located for playing cards, checkers, etc. Each room has one television set, and the two larger rooms have two. However, the entire area is very crowded, with bunks as close together as 24 inches or less. There are overhead plumbing leaks. Showers are unclean, toilet seats broken, and some lavatories do not function properly.

Public health standards recommend that an inmate housed in a dormitory be afforded a minimum of 75 square feet of living area and an additional 35 square feet of activity space. None of the rooms in K dormitory meet this standard, or even come close to it.

The other inside dormitory is called O dormitory. It contains one large room, O–1, and eight relatively small rooms. This space was not constructed for housing purposes, but has been converted for that use since 1978 because of the influx of new prisoners. O dormitory was opened May 1, 1981. The nine O rooms together contain 8,618 square feet of space, housing 210 persons. Fifty persons occupy 3,190 square feet in room O–1, while 160 persons are housed in the remaining 5,428 square feet—an average of 33.92 square feet each, including that contained in the common area in each room, and that allotted for toilets, showers, and lavatories. As in K dormitory, each room does contain a common area, with tables, and each room contains a television set (2 in O–1).

Each inmate in the K dormitories and in O–1 is furnished with a chair. However, it is so crowded in the other rooms in O dormitory that only 77 chairs are furnished for the 160 persons. In some of the rooms, the bunks are only twenty inches apart. All rooms are poorly ventilated, with the result that some are stifling, uncomfortable, and odorous. Showers and toilets in O–1 and the second floor area are in poor condition.

The outside dormitory is likewise overcrowded and has other major deficiencies. However, it is undergoing some major remodeling, so no further comment will be made as to it. It is occupied by inmates who are minimum security risks.

II. *Exercise and Recreation*

*"(a) To the greatest extent possible, consistent with the security of facilities and programs and departmental resources, the department shall establish recreational and cultural programs and activities designed to develop and maintain the physical and mental health of confined persons.*

*(b) The programs and activities should cover a wide range of interests and talents and include:*

*(1) Meaningful, relevant reading material;*

*(2) Reasonable availability of radio and television;*

*(3) Reasonable opportunities to engage in musical endeavors, painting, crafts, and other creative pursuits; and*

*(4) Availability of physical recreation and sports."* Indiana Code 11–10–11–1.

*"A confined person shall be given a reasonable opportunity for physical exercise outside of his immediate living quarters and out-of-doors if feasible."* Indiana Code 11–10–11–2.

Public Law 120, from which the above is excerpted, reads well and shows that the Legislature recognizes "evolving standards of decency." Unfortunately, defendants appear to be in violation of State law at the Indiana Reformatory, partly because of lack of funding, partly because of overcrowding, and partly because of lack of planning on the part of the defendants.

For those inmates who are in the general population and have work or study assignments, recreation during good weather months is adequate. During this time of year they are afforded approximately 90 minutes of outdoor recreation per day, in addition to the time spent out of their cells at meals and at their jobs. The outdoor facilities include two baseball diamonds, an area for football or soccer, horseshoe pits, four handball courts, two basketball courts, a volleyball court, a shuffleboard area, and room for jogging.

In the winter months and on rainy days, however, exercise is limited to the so-called fieldhouse, which is the sole facility for indoor recreation. The fieldhouse contains a tiny gymnasium simultaneously used for basketball, weightlifting, ping pong, punching bags, and television. There are four television sets hung above the bleachers, two on each side of the basketball floor. When basketball activities are taking place, or even when inmates are "pumping iron" or punching bags, it is impossible for the audio portion of the television program (or programs) to be understood. The overall impression is of bedlam.

There is an auditorium in the building, but it is not used because it is in a state of disrepair. So much for "musical endeavors, painting, crafts, and other creative pursuits."

Moreover, as of early 1982, at a time when the prison population was 1,972, only 64.4% of the inmates had assignments. The balance included 402 persons in "idle-hold" status, meaning that they were in the general population but without a job through no fault of their own. There were 277 persons in the A.S. unit and the MRU, 95 of whom were self-lockups. These persons have much less opportunity for meaningful exercise or recreation outside their living quarters.

Persons in "idle-hold," for example, are presently allowed a 90 minute recreation period each weekday, and another hour every other Saturday or Sunday. They are allowed 45 minutes for each meal, and are afforded a 10 minute shower period each night after the recreation period. Otherwise, they are locked in their cells all day. In short, they spend approximately 20 hours per day in the cramped confines of a cell or dormitory, frequently being doublecelled!

Prisoners on hold status are not permitted to visit the library (other than the law library) and are not permitted to check books out of the library. So much for "meaningful, relevant reading material." Some prisoners on idle-hold have been seeking a job for more than a year, without success.

Those in administrative segregation are even less favored—including self-lockups who may have requested being locked up for their own protection because of suspected cooperation with their jailers. They presently are permitted to go to the gymnasium two days a week for a period from 8:00–10:30 a. m., and to the commissary once a week for 45 to 60 minutes. They are allowed to make one 5 to 10 minute phone call per month. Otherwise they are locked up all the time, including meal time, as their meals are brought to them and served in their cells. Those who are "red-tagged" are held in their cells 24 hours per day except for a shower. When the weather permits outside exercise, they are allowed 30 minutes per day in a small fenced area just outside the A.S. building. The area is about 30' × 50' and no equipment is furnished other than a basketball, checkers and a checkerboard.

Although the dormitories have television sets, none is available in the cellblocks. There is no day room space provided in the cellblocks whatsoever, although it would seem that it would be possible to utilize an area in the hallway outside the first floor ranges for a day room, and supply television

in such areas. The only radio facilities in the cellblocks are jacks into which a radio may be plugged; there is a choice of three stations.

### III. Medical Care

"(c) A committed person is entitled to:

(1) Medical care, medical personnel, and medical facilities of a quality complying with applicable state licensing requirements;

(2) First aid or emergency medical treatment on a twenty-four-hour basis; and

(3) Mental health care by a psychiatrist or psychologist." Indiana Code 11–10–3–2.

"The department shall provide for the care and treatment of every committed offender who is determined to be mentally ill by a psychiatrist employed or retained by the department. To provide that care and treatment, the department may:

(1) Establish and operate its own mental health facilities and programs;

(2) Transfer offenders to the department of mental health, subject to the approval of the commissioner of mental health; or

(3) Contract with any city, county, state, or federal authority or with other public or private organizations for the provision of care and treatment." Indiana Code 11–10–4–2.

### A. Medical Services

The quantity and quality of medical care at the Reformatory has retrogressed from marginal in 1978 to inadequate in 1982. Then and now there is only one medical doctor, Dr. Choi, who theoretically is on call 24 hours per day, and who also serves as medical director. This person is a native of Korea who received the bulk of his formal medical education in that country. Because of language problems, he has a great deal of difficulty in communicating with many of his patients. Assisting him are three physician's assistants ("P.A.") and nine medical technicians ("Med.Tech."). One P.A. and two Med.Techs. have been added since 1978, but on the other hand in 1978 the institution had the services of three additional medical doctors, working on contract, and now has but one, a urologist, for one evening a week. Meanwhile, the prison population has increased by 62%.

There are also two dentists who work at the Reformatory full time. The press of work is such that they have no time for preventative or restorative work, but are largely limited to doing fillings and extractions. The medical complement is rounded out with one pharmacist, two clerks, a part time optometrist, and a hospital administrator who is about to leave.

The medical facility is contained in a separate two-story structure of brick construction within the walls. The first floor contains a sick call area, administrative offices, pharmacy, emergency room, dental department, segregation section, radiology unit and an unused kitchen. The basement and first floor hallway are used as a waiting area for those attending sick call. On the second floor, there is an infirmary section for inpatients consisting of a ward and rooms for medical isolation. There are also areas for laboratory and medical staff offices, but the laboratory is not in use.

Sick call for the administrative segregation and the MRU consists of a medical technician who goes to the cellhouse and communicates through a locked door. Dr. Choi walks through the area once a week but rarely examines the inmates. Those on hold status in the general population sign up on a sheet with the cellhouse clerk. A medical technician reviews the sheet and decides who should be given over-the-counter medications or called out to see the physician assistant, or some other option. Those in the general population group who have jobs sign out with their work supervisor and come to the infirmary where they are seen by a medical technician—a classification not recognized by Indiana laws. The medical technicians have had military corpsman training. This training emphasizes first aid but does not include physical diagnosis, which is part of the physician and physician assistant training programs.

The medical technicians have some protocols but are also diagnosing and treating things not detailed in their protocols. In addition two or three medical technicians see between 150 and 190 patients in a few hours. Since they must review the medical record and write a note in it, the number of seconds allotted to talking to the inmate—let alone examining him—is so insufficient as to guarantee inadequate services. Of the 190 requests per day the physician sees about ten patients per day in a two hour period. A physician assistant sees about 20 to 30 patients per day in a two hour period. He also performs employee exams, reviews inmates' records prior to clemency hearings, sees new commitments, does pre-work release reviews, countersigns prescriptions the medical technicians sign, and discusses patients with Dr. Choi when he has questions.

This sick call system is based on relatively untrained people being asked to diagnose and refer or treat without the proper training, supervision or time to perform such evaluations. Those inmates in lock down status have even more difficulty getting an adequate exam in the appropriate setting. Problems may be undiagnosed or inadequately treated until they become serious.

Inmates with minor ailments who require confinement to bed but no nursing care, for a short term are sent to the second floor infirmary at the institution. This room contains two rows of old beds. There is no mechanical ventilation, and no medical personnel are stationed in the ward.

Inmates with significant illness or injury requiring more specialized physician consultation or care or skilled nursing are transported to the Wishard Memorial Hospital, a unit of the Indiana University Medical Center. Transportation is provided for by van or an ambulance and usually involves about 40 minutes of travel. There are usually, at any one time, approximately 10 to 12 patients from the Department of Corrections retained at this hospital. Wishard also provides all types of outpatient consultation and during an average week the Reformatory may send 10 to 15 patients to Indianapolis for this purpose. In some instances where nearer facilities are necessary, hospitalization is utilized in nearby Anderson, Indiana.

The record is replete with evidence of inadequate medical care. For example, one inmate received a blow in the eye during a basketball game on April 28, 1978. Although he complained constantly, he was put off for one pretext or another until he was finally seen at Wishard Hospital on May 30, 1978, and a detached retina was found. He was operated on June 2, which was three weeks too late to save the eye. Another, who was taking penicillin for rheumatic heart disease when he entered the Reformatory, did not receive another prescription for 18 months. Another sought help for well over a year for a cough, severe chest pains, and difficulty in breathing. He received no help except cold medicine and cough drops from the medical technicians. He was finally referred to Wishard, where an operation disclosed a mass the size of a baseball in his right lung. Others have gone for months without detection of communicable tuberculosis.

All expert medical witnesses, including those of the defendants, were agreed that the institution should have at least two full time equivalent physician positions (80 physician hours per week). More physician assistants are also needed. The fact is that another full time physician has been authorized for years, but the Department of Corrections has been unable to fill the job because of an unrealistic wage scale. It would seem that this problem could be surmounted rather easily if the Department would simply raise its salaries for physicians.

### B. *Mental Health Care*

In 1978 the mental health care staff at the Reformatory consisted of one full time doctoral level psychologist, one full time masters level behavioral clinician, one consulting psychiatrist at four hours per week, and two consulting psychologists at eight hours each per week to conduct group substance abuse counseling. Presently, the mental health care staff consists of one full time clinical psychologist, one full time

masters level behaviorial clinician, one consulting psychiatrist at three hours per week, and one consulting psychologist at eight hours per week to conduct individual counseling and group therapy. The behavioral clinician has other duties unrelated to the delivery of mental health care to inmates that take up approximately one-half of his time. The consulting psychiatrist, Dr. H. Y. Suh, presently visits the Reformatory three hours per week and sees a total of three patients weekly.

Thus once again it may be seen that despite the surge of a 62% increase in population since 1978, the amount of staff available for care in the field of health—mental health, in this instance—has actually decreased! There appears to be virtually no oversight in the mental health area by anyone with a degree in medicine, whether psychiatrist or general practitioner. The psychologists on full time duty, who cannot prescribe medicine, have an anti-medical bias. This has resulted in psychotic inmates being deprived of medication and chained to a bed with all four limbs completely restrained in spread-eagle fashion as "treatment" when they act out their delusions. This latter practice, which has developed since 1978, was condemned by experts called by both sides and characterized as "medieval," and without parallel in any prison in the United States. This Court has heretofore issued a preliminary restraining order enjoining such practice, and finds that the same should be made permanent.

The Court finds from the evidence that the incidence of psychiatric disorders within prisons such as the Indiana Reformatory is that 2 to 4% will be acutely psychotic and require intensive hospital psychiatric care, and an additional 6 to 8% will be less severely psychotic and require convalescent hospital care or out-patient treatment. The only facility operated by the Department of Corrections for acutely psychotic prisoners is the Westville Psychiatric Unit at Westville, Indiana. There is no procedure for the rapid transfer of those persons requiring hospital care to such unit. When inmates are returned from Westville after treatment there is no regular follow-up care

at Pendleton, and psychotropic medications are frequently discontinued, with the foreseeable result that the symptoms recur and the patients once again get out of control.

During the six month period ending December 31, 1981 an average of 47 men per month were seen on a formal referral or follow-up basis, while during the same period of time an average of 64 men per month were on the waiting list and had not been seen for a period of two weeks. (During most of this period the M.A. psychologist was the only full time staff member.) Far fewer psychotic inmates have been identified than is to be expected because of inadequate screening. There is no mental health person on duty from 4:00 p. m. to 8:00 a. m. Approximately 70% of all inmates have a history of substance abuse, but only 5 are in a substance abuse program.

According to testimony which the Court finds reliable, at a minimum the mental health staff should provide from 40 to 60 hours of psychiatric service per week, and should have an additional full time clinical psychologist, four full time social workers, and three additional behavioral clinicians. In fact, a position for an additional clinical psychologist is presently authorized, but unfilled for the usual reason—the salary offered is noncompetitive. Increases in the Reformatory budget to obtain more psychiatrist time have been requested annually since 1968, and have annually been rejected.

The Court finds as a fact that the inmates in the care and custody of the defendants are not being furnished with appropriate health and mental health care as contemplated by Indiana law.

IV. *Academic and Vocational Education*

*"The department shall, after consulting with the state superintendent of public instruction and the state board of vocational and technical education, implement academic and vocational education curricula and programs for committed offenders, by utilizing qualified personnel employed by the department or by arranging for instruction to be given by public or private educational agencies in Indiana. . . ." Indiana Code 11–10–5–1.*

*"The department shall establish, maintain, and operate industry and farm programs for offenders designed to equip the participant with a marketable skill which will provide to him a means of earning a livelihood upon his return to the community. . . ."* Indiana Code 11–10–6–2.

*"(a) A confined person may be required to keep his own living quarters clean and orderly.*

*(b) A confined offender may be required to:*

*(1) Perform general maintenance work and assist in providing other services essential to the administration of the facility or program; and*

*(2) Work in a business, commercial, industrial, or agricultural enterprise operated by the department.*

*(c) A confined offender may not be denied the opportunity to participate in educational, training, or voluntary employment programs solely because of compulsory work."* Indiana Code 11–10–6–3.

The educational programs at the Reformatory consist of Adult Basic Education (A.B.E.), General Equivalency Degree (G.E.D.), and college correspondence courses. Some college courses are taught inside the Reformatory by professors from Ball State University. All A.B.E. and G.E.D. instruction is at state expense. Inmates in protective custody are not able to participate in educational programs, except for correspondence courses.

An associate degree can be obtained in Liberal Arts, Legal Assistance, Business Administration, or Criminal Justice upon successful completion of a two year program. Inmates must pay at least part of the cost of tuition, fees and books of the college programs. Since inmates in educational programs are paid 40 cents per day, the lowest inmate pay rate at the Reformatory, many inmates cannot participate in the college programs because of inability to pay.

The library is open from 9:30 a. m. to 7:30 p. m., except during meal times. However, as previously stated, those on idle-hold status are not permitted to use it. Those on self-lockup are likewise not permitted to go to the library, but may have books delivered to their cells.

As of January 12, 1982, 260 of 1972 inmates, or 13.2% of the population, were assigned to education. This is a somewhat greater number, but a smaller percentage than was engaged in educational activities in 1978 (then 218 inmates—17.1% of population). Here again is reflected the failure of defendants, and more particularly of their principal, the State of Indiana, to expand programs to keep up with the rapid increase in population. The educational programs are adequate, as far as they go, but the failure to afford educational opportunities to those prisoners in idle-hold and self-lockup status is not in compliance with State law.

The picture with regard to vocational and work programs is more of the same—some programs, but far too few to comply with I.C. 11–10–6–2. In 1978, 91.92% of all inmates had an assignment, either in prison industries, vocational training, education, or in an institutional job. By January, 1982 that percentage had shrunk to 64.4%. In absolute numbers, those employed had risen from 1,172 to 1,270, so that again the difficulty is in the failure to expand programs to fill the needs of an expanded population.

There are twelve factories or shops in the Industries Division, which include five wooden furniture factories, a metal furniture factory, and a dry kiln, a freight house, a mattress factory, a sign shop, a tag shop, and a tailor shop. They presently employ 230 inmates, which is 30 more than the authorized number of positions.

There are 13 different vocational shops, down from 15 in 1978, which teach such skills as auto body work, upholstery, printing, bricklaying, welding, etc. These programs take anywhere from four months to one year to complete, and there are no advanced courses available. Inmates who have completed vocational training in one area are discouraged from taking courses in any other area. There are 136 inmates in

these programs, six *less* than the number enrolled in 1978.

Industrial safety and hygiene are poor, with most shops and factories out of compliance with Occupational Safety and Health Administration (OSHA) minimum standards. Inadequate ventilation is a particular problem in the furniture factories and paint spray booths. Toxic glues are used without adequate ventilation, and without benefit of respirators or gloves, as required by OSHA regulation. Noise levels in some areas far exceed the maximum allowable.

V. *Safe and Healthful Environment*

*"(a) The department shall adopt policies and procedures for the protection of committed persons, including:*

*(1) The monitoring of committed persons whose presence in the general population of a facility or program constitutes a threat of physical danger to other persons;*

*(2) Reasonable searches of committed persons, facilities and premises to reduce the number of weapons and dangerous items;*

*(3) Adequate staff supervision of committed persons, including living quarters;*

*(4) Maintenance of accurate records regarding incidents of violence; . . ." Indiana Code 11–11–6–1.*

*"(a) The facilities of the department must comply with federal and state health, sanitation, safety, and fire laws applicable to dwellings, food establishments, eating facilities, and public buildings." Indiana Code 11–11–6–2.*

As just mentioned above, the shops and factories violate OSHA standards in many respects, and are thus unsafe. Of more importance however, since a much larger number of inmates is involved, is the failure of the institution to meet state and federal health, sanitation, safety and fire laws.

### A. *Fire Protection*

The last report of the State Fire Marshal in evidence, dated July 20, 1981, listed 122 separate remedial activities necessary to place all buildings and procedures in compliance with state fire laws and regulations. Compliance was ordered to be performed within 30 days.

On September 21, 1981 Warden Owens responded to the Fire Marshal, as directed. His response reflects compliance, or compliance in progress as to the more simple requirements, such as removing excess flammable liquids from the shoe shop and installing approved exit lights in nine buildings. However, practically all substantive requirements requiring the expenditure of money were met by comments such as "When funding becomes available," or "To be completed with Master Plan Renovation." In other words, perhaps never.

Typical outstanding violations of the fire laws as applied to public buildings are as follows: the school building, all three dormitories, all three cellhouses, the infirmary, the fieldhouse, and the second floor of the officers' quarters all require a fire alarm system with interconnected smoke detectors; a second egress is required from the library, certain classrooms, both floors of the dormitories, all cellhouses, the second floor of the officers' quarters, and from dead end corridors in the infirmary; spray booths in three of the furniture factories and the auto body shop do not meet standards, nor do the paint storage areas. Many more deficiencies exist.

### B. *Food Services*

Meals for the general population are served three times a day in a central dining room or mess hall, and are based upon a master menu cycle of five weeks. The menus provide adequate variety and sufficiently meet nutritional standards. The inmates eat with plastic utensils.

Those inmates confined in the various segregation units are fed the same diet as those in the general population, and the food is prepared in the same kitchen. Food is served to these inmates in their cells, after being heated on a hot cart at the unit. However, there is no dietician on the staff, and those inmates who require special diets, such as diabetics, must rely on the food service manager and an inmate assigned to this task. Special diets are not adequate.

Sanitation problems have plagued the Reformatory food service operation in the past, and continue to do so. The last reported inspection by the Indiana State Board of Health, dated January 7, 1982, reflected violations in 15 out of 44 items inspected in the main kitchen. The main kitchen, commissary, and outside storage facility were all noted to have mice and roaches.

Inspection of the kitchen on December 9–11, 1981 by a nationally recognized health consultant and registered sanitarian revealed a kitchen floor which is literally uncleanable because of holes, cracks, crevices, missing tile and gross porosity. Some of the ceiling is missing. Many of the walls are crazed and cracked. Live cockroaches and fresh mice droppings were observed in the downstairs storeroom. Many pieces of large equipment (pots, pans, large kettles) are in such poor repair that they cannot be cleaned by ordinary methods and hence are not sanitized. Ranges, hoods, cutters, choppers and refrigerators all needed cleaning. In the dining room, the food-warming tables were not operative and therefore the hot foods were below safe temperatures.

Fortunately, this is one area in which State action is being taken to correct the hazardous situation now existing. The General Assembly has appropriated $12,000,000 for construction and rehabilitation at the Reformatory, and funds have been allocated to remodel the kitchen completely, so as to bring it into compliance with public health standards. It is expected that bids on this project will be taken in June, 1982.

### C. *Environmental Health Problems*

The presence of roaches and rodents in the kitchen and food storage areas has already been mentioned. These pests are under control in the housing areas. However, the dormitory areas and one cellblock have heavy fly populations during fly season. Windows in such facilities are not screened; when open, they admit flies, flying insects and birds. A standing order issued to the Reformatory fire chief in 1977 was to hose down the cellblocks weekly to remove bird excrement. Birds in living areas create the risk of transmission of histoplasmosis to inmates.

The plumbing chases throughout the institution, with few exceptions, are dirty and not well maintained. These areas, if not properly maintained, may be conducive to the harborage and multiplication of insects, rodents, and other vermin. These deficiencies, as well as the inability to clean toilets and sinks and the absence of hot water in cells, all constitute serious potential threats to personal health.

The overcrowding of inmates, coupled with the grossly inadequate ventilation, likewise invites public health concerns. One method to control the spread of communicable diseases which are transmitted via the air is to control the ventilation; at the Reformatory, this type of control does not exist. The conditions which exist are conducive to the easy spread of respiratory and droplet infectious diseases. Other illnesses attributed to poor ventilation include problems of headaches, nausea, and nasalpharyngeal irritation.

Inadequate lighting makes improved sanitation more difficult, and increases eyestrain when visual tasks are involved. It is incongruous that persons in the A.S. unit, who have the least time out of their cells and must thus rely almost wholly upon reading as recreation/education, are given the light bulbs with the smaller wattage. This smacks of punitive action. Still another problem is disintegrating asbestos insulating material, which raises the threat of asbestosis.

### D. *Protection of Committed Persons*

Security of inmates from physical attacks by other inmates is a problem at the Reformatory. Severe forms of violence, including stabbings, bludgeoning and homosexual rapes, occur with distressing frequency. A number of these incidents have resulted in fatalities. Lesser forms of violence, such as harassment, threats, intimidation, striking and beating may be said to be routine. There are two primary causes for these problems: overcrowding and insufficient staff.

All witnesses, whether called by plaintiffs or defendants, agreed that the Reformatory is severely overcrowded. It is at least 50% over design capacity. The dormitories, in the words of one witness, are overcrowded to the point of bumping and elbow knocking. Coupled with the extremely poor ventilation, resulting in more discomfort, the situation is one of constant aggravation.

When the dormitories became double bunked, gambling commenced, racial tensions increased, more fights broke out, and homosexual activity increased. The double bunking creates a visibility problem for security officers, inasmuch as clothing, sheets and blankets draped from a top bunk cut off the view beyond them. Visibility may also be impeded by inmates sitting on the top bunk with their legs hanging over the side.

One of defendants' employees, the clerk of H cellhouse, described the change of conditions in the cellhouse since doublecelling has been instituted. In his words, tension has been increased 100% to a "blowing" level, sanitation has gone downhill, and much fighting and arguing takes place. The cellhouse formerly settled down for the night at from 11:00 to 11:30 p. m., but the noise and disturbances have now increased to the point that it does not settle down until from 2:30 to 3:30 a. m.

The defendants themselves, as reflected by the Department of Corrections Master Plan, have called for one person per cell of 80 square feet, and a dormitory population not exceeding one person per 130 square feet of net area. This is a humane policy, in keeping with evolving standards of decency and the guidelines adopted by leading penal authorities in this country. In contrast to these self-imposed guidelines, the defendants are now holding hundreds of grown men in custody for as much as 23 hours per day in less space than is required by law for a dog or a cat in the City of Indianapolis. (See Sec. 6–7, *Indianapolis Code, supra.*)

No officer is stationed inside a dormitory room. Rather, one officer is located on each floor of O and K dormitories, in the hallway outside the dormitory. The officers patrol the hallways and look into the dormitory rooms through windows facing on the hallways; of course, they may enter the rooms when they choose, but they seldom do so. In either event they are not able to see to the back of the rooms because of the problem mentioned above concerning clothing, etc., hanging from the bunks. Rooms O–9 and O–10, converted storehouse rooms, can scarcely be seen into at all from the hall. The doors to these rooms are locked, and the inmates are in charge. The officers have standing orders not to enter a dormitory room to quell a disturbance without getting assistance, but they have no way of communicating with each other except by shouting.

The day shift in each cellhouse (7:00 a. m.—3:00 p. m.) calls for a sergeant and three correctional officers. The sergeant has a walkie-talkie radio by which he can communicate with officers elsewhere in the institution, but the cellhouse officers have no way of communicating with each other or the sergeant other than word of mouth. Although the officers patrol the ranges, they restrict such patrols to the lowest floor. From this position they cannot see to the back of the cells on the upper two floors. In short, if an inmate on an upper tier is attacked in his cell by a cellmate, or by any occupant of the range during a general prisoner movement, such as going to work, eat, or shower, he has two chances of obtaining timely assistance: slim and none. The practice in most prison systems is to have a correctional officer stationed on each range or tier of a multi-tiered cellhouse.

All things considered, it is not surprising that the number of persons asking to be placed in administrative segregation as self-lockups has increased sharply since the beginning of doublecelling. There are three times as many persons in self-lockup now as in 1978, in absolute numbers, and 85% more in terms of percent of the total population. It will be remembered that these inmates are not in violation of prison rules or regulations, but in general are those youthful

and first offenders threatened by sexual attacks, or other prisoners who fear for their lives because of some real or fancied violation of the prisoners' code, or an outside vendetta carried over into the prison, etc. The Court has no doubt but that the number of self-lockups would be substantially higher but for the policy of the defendants in denying them access to educational, industrial, or vocational programs, and in confining them all day in double cells.

## VI. *Prison Discipline*

The disciplinary policy and procedures for adult offenders is set out in a booklet published by the Department of Correction, a copy of which is in evidence. The rules set out therein became effective May 15, 1980, and generally track the procedures required by the constitution for prison disciplinary systems, as outlined in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Hayes v. Walker,* 555 F.2d 625 (7 Cir. 1977).

The only perceived omission from the rules laid down in the above cases is that the Conduct Adjustment Board ("CAB") is not required to put in writing the reason why it refuses to call a witness or witnesses sought to be called by the offender in those cases where it declines to call such a witness. This should be corrected. Also, as a matter of practice, the CAB ordinarily meets during the first shift at the prison and frequently refuses to call as witnesses prison personnel who work on another shift. Neither possible inconvenience to such a person, nor the necessity of paying him overtime if he is required to come to the prison and testify is sufficient to excuse this practice.

The Court finds that, except as set out above, the plaintiffs have failed to carry their burden of proving that the system of institutional discipline in force at the Reformatory is in violation either of state or federal law.

## VII. *Access to the Courts*

In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court reaffirmed its decision in *Younger v.* *Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), and held that access to the courts through the provision of law libraries or adequate assistance from persons trained in the law is constitutionally mandated.

The Court finds that inmates at the Reformatory are provided meaningful access to the courts. The law library is open from 9:30 a. m. to 7:30 p. m., except during lunch and dinner. The library is sufficiently stocked with reporters, statutes, and reference books. The library is staffed by inmate clerks who provide assistance to other inmates. These inmate clerks can take requested legal materials to inmates on segregation and assist them in their research. Inmates assigned to the outside dormitory have access to the law library one-half day a week and can obtain greater access upon request and a showing of need.

Thus, the Reformatory provides not only an adequate law library but has a system of inmate clerks who assist other inmates in research and drafting. While these clerks have limited legal training and often have too many inmates to counsel, this assistance, combined with the library, provides meaningful access to the courts.

### *Conclusions of Law*

■ Based upon the foregoing findings of fact, the Court, in the exercise of its pendent jurisdiction, concludes as a matter of law that the defendants, in their official capacities, are in violation of each of the following Indiana statutes with respect to their treatment of plaintiff class: Indiana Code, Sections 11–10–3–2(c), 11–10–4–2, 11–10–5–1, 11–10–6–2, 11–10–6–3, 11–10–11–1, 11–10–11–2, 11–11–6–1, and 11–11–6–2. None of the statutes in question specifically covers the question of doublecelling in the cellhouses or that of the use of double-decked bunks in the dormitories (previously referred to herein as "double bunking").

The defendants argue, on the authority of *Rhodes v. Chapman, supra,* and *Bell v. Wolfish, supra,* that there is no constitutional prohibition against the use of doublecell-

ing or double bunking. This is true. However, the two cases relied upon merely serve to point up specific situations in which the facts did not demonstrate a violation of the Eighth Amendment's ban on cruel and unusual punishment. In *Bell v. Wolfish* the complainants, pretrial detainees, were housed two to a cell in cells having a total floor space of approximately 75 square feet during the period 11:00 p. m. to 6:30 a. m. (plus time for two brief head counts). Thus they were confined to their cells only during normal sleeping hours, and during the balance of the day were free to move about between their rooms and the common areas. The place of confinement was the Metropolitan Correctional Center ("MCC"), a newly erected facility in the Southern District of New York, described by the Supreme Court as follows: "The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates . . . ." Finally, the average length of stay in the MCC was only about 60 days.

Similarly, in *Rhodes v. Chapman*, the institution under consideration, the Southern Ohio Correctional Facility ("SOCF") was less than 10 years old. Its 63 square foot cells each have a heating and air circulation vent near the ceiling, most have a window that inmates can open and close, and adjacent day rooms which are open between 6:30 a. m. and 9:30 p. m. Each day room contains a wall-mounted television, card tables, and chairs. Inmates can pass between their cells and the day rooms during a 10 minute period each hour. The district court described other features of the prison, including an adequate air ventilation system, cells substantially free of offensive odor, well controlled temperature in the cellblocks, lack of excessive noise, and adequate ratio of guards to inmates, etc., and summarized the physical plant as "unquestionably a top-flight, first class facility." Nevertheless, the district court found that doublecelling was cruel and unusual punishment because, among other things, SOCF was 38% over its "design capacity," and the court believed that contemporary standards of decency required each inmate to have at least

50–55 square feet of living quarters. The Court of Appeals for the Sixth Circuit affirmed on the ground that the district court's findings were not clearly erroneous. The Supreme Court reversed, holding that "In view of the District Court's findings of fact, its conclusion that doublecelling at SOCF constitutes cruel and unusual punishment is unsupportable. Virtually every one of the court's findings tends to *refute* respondents' claim . . . ."

In contrast to the new, clean, and relatively comfortable facilities described in *Wolfish* and *Rhodes*, each affording the inmates ample time and space for day room activities, we find in the Indiana Reformatory the "barred cells, dank, colorless corridors, and clanging steel gates" absent from the New York MCC. More particularly, we find a 59 year old structure with inadequate ventilation, erratic heating, no cooling, and archaic electric wiring. Moreover, we find that no cells contain hot water, the plumbing is cracked and dirty to the point that it cannot be made completely clean, and the number of showers in both the cellhouses and dormitories is inadequate. Ventilation and temperature regulation in the dormitories is virtually nonexistent. The kitchen is unsanitary and cannot be sanitized because of physical deterioration; it would be condemned were it not operated by the State. Fire protection laws are also violated routinely, with no means to place the structure in compliance therewith. The cellhouses contain no day room or equivalent space for exercise/movement/recreation, so the several hundred inmates in idle-hold and administrative segregation, including self-lockups, are required to spend from 20 to 23 hours per day locked in their cells. Medical treatment is delayed and inadequate, and there are insufficient jobs and programs to keep the prisoners busy. There is inadequate staff supervision to insure the safety of committed individuals.

It is in this environment that we find 336 double cells, providing each occupant with from 22 to 23.8 square feet of space, less that taken up by the beds, the lavatory, and the commode. All dormitories are double

bunked, which allows an average of 55.8 square feet per prisoner, less that taken up by the bunks, day rooms, toilets, lavatories and showers. All witnesses, including the defendants' experts, agree that the prison is severely overcrowded and that such overcrowding, in particular the doublecelling and double bunking, coupled with all of the other conditions in evidence, has caused the confined persons unusual stress, discomfort, aggravation, and pain.

This Court finds that the present overcrowding of the institution, coupled with all of said other conditions, considered as a whole, constitutes cruel and inhuman treatment of its inmates, in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

Although we have found the defendants, in their official capacities, to be in violation of both state and federal law in their operation of the prison, it is only fair at this point to analyze the reasons for such failure to follow the law. The fault lies with elected officials of the State of Indiana. The Court knows judicially that the General Assemblies through the years, while legislating lengthened sentences for violations of criminal law, have failed to appropriate sufficient funds to provide for normal upkeep of state penal institutions, much less to build new ones to accommodate the increased number of prisoners. Past General Assemblies have also failed to appropriate funds sufficient to permit the defendants to hire a sufficient number of qualified personnel and to establish adequate programs as contemplated by Indiana law.

The General Assembly of 1979, in enacting Public Law 120, demonstrated an awareness of the needs of persons confined in penal institutions. It also appropriated $600,000.00 for architectural design for new construction and rehabilitation of old buildings at the Reformatory. The 1981 General Assembly has appropriated $12,000,000.00 for major construction at the Reformatory, plus many millions for construction and repair at the other penal institutions. It is to be hoped that these recent positive acts evidence an increasing awareness that the State is confronted with a critical situation which must be met. Meanwhile, however, state court judges continue to sentence more and more persons to prison in response to the justifiable public demand for law and order, and prosecuting attorneys argue for longer and longer sentences. There is little or no coordination between the judicial branch of state government, which does the sentencing, the executive branch, which is responsible for the administration of the prisons, and the legislative branch, which prescribes the range of punishment and is responsible for providing all necessary funding.

Faced with increasing numbers of commitments, longer terms, inadequate physical facilities, and inadequate funding, the defendants appear to the Court to be carrying on a valiant but losing battle to accommodate those persons entrusted to their care. Certainly their failure to carry out the law in their official capacities does not mean that, as individuals, they are callous, indifferent, inept, negligent, or willfully perverse. The contrary is true. They are simply overwhelmed despite their efforts to avoid the present crisis by developing some years ago their Master Plan—largely ignored by the General Assembly until 1981.

Certainly this Court has no objection to requiring lawbreakers to serve terms of imprisonment, and neither does it believe that a prison should be a country club. However, when a prison has been found to be operated in plain violation of law, the Court has the power, and it is its duty, to order appropriate remedial action. With regard to the constitutional violation the remedy must be to reduce the overcrowded population and eliminate doublecelling and double bunking at the Reformatory, all as more particularly set out in the order accompanying this Memorandum of Decision.

The defendants, in their post-trial brief, have cited cases holding that, considered separately, various of the state law violations found to exist do not constitute violations of the federal constitution. This is true. *Bono v. Saxbe,* 620 F.2d 609 (7 Cir. 1980). However, defendants do not deny

that state law has been violated, merely giving lack of funds as an excuse. Lack of funds indeed explains many of said violations, but does not excuse them in the sense that no remedial action may be ordered by this Court. This Court has jurisdiction over the pendent claims based on state law and must therefore grant such relief as appears necessary from its findings of fact and conclusions of law, all as set out in the accompanying order.

Each separate order shall be deemed to constitute a conclusion of law that such relief is legally necessary, based upon the findings of fact contained in this Memorandum of Decision, and the same are incorporated herein by reference.

## ORDER

The Court having this day filed its Memorandum of Decision in the above entitled cause, containing its findings of fact and conclusions of law, as follows: (H. I.), now pursuant thereto IT IS ORDERED, ADJUDGED AND DECREED that the defendants, their agents, successors in office, and all persons acting in concert or participation with them, shall comply with the following requirements:

1. Effective September 1, 1982, and thereafter, the population at the Indiana Reformatory shall not at any time exceed 1,950 persons.

2. Effective January 1, 1983, and thereafter, said population shall not exceed 1,750 persons.

3. Effective January 1, 1984, and thereafter, said population shall not exceed 1,375 persons. This figure will be modified to take into consideration any newly constructed housing, if any.

4. Effective January 1, 1983, and thereafter, no more than one inmate shall be assigned to any cell.

5. Effective January 1, 1984, and thereafter, double bunk beds shall not be used in any dormitory.

6. At the earliest possible time and by no later than September 1, 1982, the medical staff at the Reformatory shall include at least two (2) full time medical doctors, five (5) full time physicians' assistants, a full time hospital administrator, a full time pharmacist, a psychiatrist or psychiatrists for at least 40 hours per week, two (2) Masters level psychiatric social workers, one (1) Ph.D. clinical psychologist, two (2) behavioral clinicians, nine (9) medical technicians, and two (2) full time clerk typists. All medical personnel shall be fully qualified, and all newly hired personnel must be able to converse fluently in the English language. If qualified personnel cannot be obtained at present salary levels, raise the levels.

7. On September 1, 1982, the maximum restraint unit at the Reformatory shall be closed and it shall not thereafter be used to house inmates, unless by that time all cells and fixtures are completely rehabilitated, lighting equivalent to 30 footcandles per cell is furnished (controllable from within and not from without the cell), and the "box car" doors are removed.

8. The kitchen and dining room at the Reformatory shall be brought into compliance with Indiana State Board of Health standards by no later than September 1, 1982 and maintained in accord with those standards thereafter.

9. Each inmate at the Reformatory shall have the opportunity to engage in recreation, outside his living unit, for at least 90 minutes each day. Each inmate shall be given a choice each day of taking the recreation indoors or outdoors. For inmates in general population and in self-lockup this paragraph shall be effective immediately. For inmates confined to the administrative segregation unit for disciplinary reasons, or to the maximum restraint unit, the indoor recreation may be in the living unit until January 1, 1983.

10. Defendants shall provide all inmates on self-lockup or other inmates segregated for nonpunitive reasons with access to programs, activities, and counseling available to the general population inmates. Within 30 days, defendants shall submit specific plans to comply with this paragraph, to be effective September 1, 1982.

11. Defendants shall not punish inmates by confining them to administrative segregation or the maximum restraint unit or subjecting them to other grievous loss without first according to them a hearing where the inmate is afforded the opportunity to call witnesses in his own behalf. The right to call a particular witness can only be denied when the record reflects a justifiable reason for failing to call the desired witness.

12. Defendants shall provide medical care facilities and equipment sufficient to make available adequate medical care to the inmate population. Within 30 days, defendants shall submit specific plans to comply with this paragraph by January 1, 1983. Said plans shall include development of alternative emergency care facilities, provisions for the prompt referral of inmate patients for diagnosis and treatments without nonmedical limitations on the number of daily referrals, obtaining adequate medical equipment, and either renovating the present facility or constructing a new medical facility at the Reformatory.

13. Defendants shall establish adequate and proper procedures for the delivery of medical care to the inmate population. Within 30 days, defendants shall submit specific plans to comply with this paragraph by September 1, 1982. Said plans shall include procedures for sick call open to all inmates at least six (6) days per week, delineation of responsibility and authority between the various medical personnel, provisions for close supervision of all nonphysician personnel, and provisions for daily sick call for all inmates confined to their cells.

14. Defendants shall use every effort to secure sufficient staff to safely and securely operate the Reformatory with additional attention being given to the dormitories and upper tiers of the cellblocks. The defendants will submit a plan for complying with this paragraph within 30 days with compliance to occur within 60 days thereafter.

15. As soon as practicable, but no later than September 1, 1982, the defendants shall provide each inmate with an educational, vocational or job assignment. A new inmate shall receive an assignment within 30 days of his reception at the Reformatory. However, inmates receiving disciplinary sanctions may be deprived of an assignment for up to 60 days, and any inmate removed from an assignment for inadequate performance may be assigned to idle status for a period up to 30 days.

16. Defendants shall provide substance abuse programs and mental health services and counseling for those who need and want such treatment. Within 30 days the defendants will submit a plan for compliance with this paragraph, including crisis intervention, so that compliance will occur on or before September 1, 1982.

17. Defendants shall within 60 days submit to the Court a plan which will provide for preparation and distribution of special medically prescribed diets under the supervision of qualified personnel.

18. Defendants shall not undertake the conversion of existing buildings into housing units without prior approval of this Court.

19. The preliminary injunction issued by this Court on March 5, 1982, which enjoined the use of mechanical restraints, as therein defined, is made permanent.

20. All buildings at the Reformatory requiring structural changes shall be brought into compliance with the standards of the office of the State Fire Marshal on or before January 1, 1984.

21. All operations in the various places of work and training at the Reformatory shall be brought into compliance with the regulations of the Occupational Safety and Health Administration on or before January 1, 1984. Paint spray booths and areas in which toxic glues are used shall be brought into compliance within 90 days of this date.

22. In connection with the construction and rehabilitation of buildings within the Reformatory, defendants shall give consideration to using the labor of inmates to the greatest extent practicable, at wages which are reasonable under all of the circumstances.