Clyde MILES, et al., Plaintiffs,

v.

Griffin BELL, et al., Defendants.

Michael HEYMANN, Plaintiff,

v.

BUREAU OF PRISONS, Defendant.

Civ. A. Nos. B–79–137 (TFGD),
B–82–626 (TFGD).

United States District Court,
D. Connecticut.

June 28, 1985.

Ruling On Defendants' Motion
To Dismiss Aug. 28, 1985.

Richard A. Silver, Leora Herrmann, Stanley Twardy, Ernest F. Teitell, Silver, Golub & Sandak, Stamford, Conn., for plaintiffs.

Thomas G. Dennis, Federal Public Defender, Brien J. Wholey, Hartford, Conn., for petitioner Michael Heymann.

Alan H. Nevas, U.S. Atty., Thomas J. Riley, Asst. U.S. Atty., New Haven, Conn., Barry K. Stevens, Asst. U.S. Atty., Bridgeport, Conn., for defendants.

Donald Lareau, pro se.

## MEMORANDUM OF DECISION

DALY, Chief Judge.

The instant case arises out of the overcrowding at the Federal Correctional Institution at Danbury, Connecticut. The plaintiff class alleges that the overcrowding has created conditions of confinement violative of the Eighth Amendment to the United States Constitution. Plaintiffs also assert claims pursuant to the Federal Torts Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*

The Court trifurcated the trial as follows: the first phase of trial would address liability on the injunctive claim, determining whether the conditions at F.C.I. Danbury constituted cruel and unusual punishment in violation of the Eighth Amendment; the second phase of trial would determine plaintiffs' claims for damages under the FTCA; and if liability was established at either or both of the first two phases of trial, the third stage would address the question of remedy.

In its ruling of February 26, 1985, the Court found moot the pretrial detainees' claim for injunctive relief from the allegedly unconstitutional conditions at Danbury. Thus, this Memorandum of Decision, which follows the first phase of the trial, addresses only whether the conditions of confinement of sentenced inmates at Danbury are violative of the Eighth Amendment of the United States Constitution.[1] For the reasons set forth below, the Court finds that those challenged conditions which are not moot, considered individually and in combination, do not constitute cruel and unusual punishment in violation of the Eighth Amendment.

F.C.I. Danbury was built in 1939 and was designed to house approximately 500 sentenced inmates. (Gunnell). At the time of trial, the main compound held approximately 730 inmates. (Craddock, Gunnell). According to the affidavit of William Ray Wood submitted in response to the Court Order of April 13, 1984 reopening the record, the population at Danbury continued to increase after the conclusion of trial. It is undisputed that Danbury is severely overcrowded and the Court so finds.

As plaintiffs state in their Proposed Findings of Fact Concerning Sentenced Inmates,[2] the focus of plaintiffs' case is the overcrowding in particular housing units at Danbury. The units specifically at issue are 5/O, 6/I,[3] 10/D (the prison's three open dormitories), 7/O, 11/A (the open bay portions of two partially cubicled dormitories), 9/D and 12/A (the "flats" or rows of nine to twelve beds placed in the corridors of the preferred housing cell blocks in 9/D and 12/A). Plaintiffs' Proposed Findings of Fact at 1–2. These units are hereinafter referred to as open dormitories.[4] Plaintiffs claim that this particular housing method has created or led to many of the conditions which they challenge.

The affidavit of William Ray Wood submitted July 12, 1984, indicates that significant modifications have been made at Danbury since the time of trial. The five open dormitories at issue, units 5/G, 6/I, 7/G, 10/D, and 11/A,[5] are now almost entirely made up of cubicles.[6]

1. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

2. For purposes of convenience, and since the claims of the pretrial detainees have already been determined, the Court refers to both plaintiffs' and defendants' Proposed Findings of Fact Concerning Sentenced Inmates and Proposed Conclusions of Law Concerning Sentenced Inmates as simply "Proposed Findings of Fact" and "Proposed Conclusions of Law".

3. Some of the evidence at trial refers to Unit 6/O. This unit designation was changed to 6/I. The Court notes that the parties refer to the unit both as 6/I and 6/O in their briefs.

4. Open dormitory housing is essentially housing a large number of inmates, ranging from about 60 to 95, in one large room in rows of beds, some single and some bunk beds, in a manner similar to an army barracks. The beds are placed quite close together, sometimes as close as one and one-half feet apart. The beds generally have lockers or cabinets between them for the inmates' personal belongings.

5. Several of the unit designations have changed since the time of trial and after the filing of post-trial briefs. Unit 5/G was formerly unit 5/O and 7/G was formerly 7/O. Thus, the five units addressed in the affidavit are those five units challenged in this case. See Letter of Barry Stevens, Assistant United States Attorney, dated March 29, 1985. Throughout this opinion the Court refers to the dormitories as they were designated at the time of trial.

6. The affidavit indicates that unit 5/G is entirely made up of cubicles with the exception of two inmates housed outside of cubes. Units 6/I and 7/G have one bunk bed outside of a cubicle. Unit 10/D has four double beds in a separate room at the south end of the unit. Unit 11/A has four beds outside of cubicles.

The installation of these cubicles has, in the Court's view, a substantial effect upon many of the conditions in the living units challenged by plaintiffs. The cubicles have effectively replaced dormitory housing.[7] Based on the installation of cubicles, the Court finds that to the extent plaintiffs' claims are directly related to a housing method no longer used, the claims are moot.[8]

For the sake of clarity, the Court discusses those challenged conditions which are directly related to the dormitory housing method and which are now moot.

Specifically, plaintiffs challenge the dormitory units based on the increased illness rates among inmates housed in dorms. Plaintiffs also contend that dormitory living is psychologically harmful to the inmates because of increased stress, lack of control over their own environments and lack of privacy. Further, plaintiffs assert that the number of inmates in one room affects the air quality in the dormitories and the ventilation in the dorms is so inadequate as to constitute a violation of the Eighth Amendment.

Plaintiffs' claim of increased illness rates among inmates was specifically limited to inmates housed in open dorms. In fact, much of plaintiffs' proof on this issue consisted of comparisons of illness rates in dormitories with illness rates for other housing methods such as cubicles or single or double cells. The testimony at trial did establish a higher illness complaint rate and, in the Court's view, a higher level of illness among inmates housed in the open

dorms. Dr. Paul B. Paulus testified that the close proximity of inmates led to an increased incidence of contagious diseases and the breakdown of the immune system, increased stress, a lack of privacy, and increased conflict.[9] Dr. Paulus testified that these living conditions presented an obvious health hazard and he concluded that they did not provide the minimum requirements for a healthful environment.

However, Dr. Paulus also testified that the situation could be corrected by either a reduction in population or the installation of cubicles to provide inmates with barriers from the contagious diseases of others and to decrease inmate stress. Paulus testified that he would recommend the installation of cubicles which would mitigate to a large extent, in at least 75% of the cases, the negative effects of open dormitory living. (Paulus). By regulating the interaction of inmates, Paulus stated that cubicles would eliminate some of the spread of illness, feelings of crowding, tension and stress.

■ Thus, plaintiffs' own witness testified that the installation of cubicles would correct many of the conditions plaintiffs challenge. Without finding that the cubicles have had that effect at Danbury (since that question is not before the Court), the Court finds that the plaintiffs claim regarding increased illness rates in the open dorms is moot since the open dorms no longer exist.

■ In addition to the increase in physical illness, plaintiffs also allege that dormitory housing is psychologically harmful to

---

7. Plaintiffs claim that the "flats" in units 9/D and 12/A also constitute the focus of their case. However, the evidence at trial did not relate to the flats, but only to the open dormitories. Although the flats are similar to the open dorms in that inmates are not confined in cells, there are many differences which make plaintiffs' arguments regarding the dorms inapplicable to the flats. Furthermore, references in the testimony to units 9/D and 12/A do not differentiate between the preferred cell blocks in those units and the flats. Thus, the Court finds the evidence as to the flats insufficient to establish a constitutional violation.

8. The Court notes that the question of whether the installation of cubicles rendered moot some or most of plaintiffs' claims was not briefed by the parties. The Court learned of the installation of cubicles on July 12, 1984, through the Wood affidavit long after the submission of post-trial briefs. Nevertheless, the Court addresses the issue of mootness and finds that many of plaintiffs' claims are indeed moot.

9. Plaintiffs rely on two studies of the increased illness rates among Danbury inmates: one conducted by Drs. Paulus, Cox and McCain in 1978–79 and one conducted by Dr. Gerald Gaes, research analyst for the Bureau of Prisons, in 1982.

inmates in violation of the Eighth Amendment. As Dr. Paulus testified, however, cubicles would effect psychological well-being in addition to physical health because they afford inmates a much greater degree of privacy and control over their own environments. The decrease in stress would likely improve both the physical and mental states of the inmates. Plaintiffs' claims of unconstitutional psychological or mental harm due to the open dorms are, therefore, also moot in view of the installation of cubicles.

Plaintiffs' claim of inadequate ventilation was also limited to the ventilation in the dorms. *See* Plaintiffs' Proposed Findings of Fact, Nos. 25–38. Unlike the claims with regard to increased illness, there was no testimony at trial as to the effect of the installation of cubicles upon ventilation. As a practical matter, the barriers created by the cubicles would decrease the effects of smoking and body odor of other inmates. It would also seem to reduce drafts of which at least one inmate complained. In this context, the Court notes the inherent inconsistency in plaintiffs' challenge of the ventilation in the dorms. On one hand, plaintiffs object to the F.C.I. procedure which prohibits opening windows during the winter, complaining of stifling heat. On the other hand, plaintiffs are heard to complain of drafts due to windows that do not close properly. While these allegations indicate some problem with temperature control, they do not indicate inadequate ventilation.

■ In any event, the Court finds that the installation of cubicles provides an inmate with control over his own environment such that the conditions which make up plaintiffs' challenge to ventilation are substantially changed and, thus, plaintiffs' claim of inadequate ventilation in the dormitories is moot. In connection with plaintiffs' ventilation claim, the Court notes, however, that the ventilation in the dorms was tested and the figures for cubic feet per minute per person in the dorms proved to be within the standards set by the American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE).

■ The Court finds that there are no longer any open dormitory housing units at Danbury and thus, defendants have voluntarily ceased most of the allegedly unlawful conduct. In determining whether voluntary cessation of allegedly illegal conduct renders a claim moot, the Court must consider the likelihood of recurrence. *See City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *U.S. v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1952).

The Court finds that there is no reasonable likelihood that the cubicles, having been installed, will be removed or that Danbury will resume open dormitory housing. Further, even if F.C.I. Danbury were to resume housing inmates in open dorms, and even if that open dorm housing were to lead to recurrence of the allegedly unconstitutional conditions, such an event would not evade review. *See Preiser v. Newkirk,* 422 U.S. 395, 403, 95 S.Ct. 2330, 2335, 45 L.Ed.2d 272 (1975); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Therefore, those claims described above, which are directly related to the open dormitory housing method, are moot.

In determining that much of plaintiffs' case is moot, the Court finds it especially significant that plaintiffs have not challenged the constitutionality of any of the living units made up of cubicles. In fact, plaintiffs specifically excluded the cubicled portions of living units 7/O and 11/A, challenging only the "open bay" portions. Moreover, plaintiffs introduced no specific evidence concerning the living conditions in cubicled housing units.

Despite the fact that the focus of plaintiffs' case is the conditions in the open dormitories, the Court finds that some of the conditions plaintiffs challenge are not directly affected by the installation of cubi-

cles. Those claims are not moot and the Court will address them *seriatim* after setting forth the general principles of law applicable to the plaintiffs' Eighth Amendment claim.

■ Confinement in a federal penitentiary is a form of punishment subject to scrutiny under Eighth Amendment standards. *Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978).

■ The Eighth Amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain, *Rhodes v. Chapman,* 452 U.S. at 346, 101 S.Ct. at 2399; *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976), or are grossly disproportionate to the severity of the crime. *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399; *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977); *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Unnecessary and wanton inflictions of pain include pain "totally without penological justification." *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399; *Gregg v. Georgia,* 428 U.S. at 183, 96 S.Ct. at 2929; *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). *See generally Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir.1984) (conditions of confinement of condemned inmate in special unit for condemned prisoners found not violative of the Eighth Amendment); *Jackson v. Meachum,* 699 F.2d 578, 581 (1st Cir.1983) (discomfort compelled by conditions of confinement, without more, found not violative of the Eighth Amendment).

■ There is no static test for determining whether conditions of confinement are cruel and unusual. *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399. The Eighth Amendment must "draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399

(citing *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) ).

The specific categories of Eighth Amendment concern were set forth by the Second Circuit in *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds, sub nom, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). There, the Second Circuit stated that sentenced prisoners are entitled only to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Id.* at 125. "To the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399.

■ The Court recognizes that federal courts should not become "enmeshed in the minutiae of prison operations." *Bell v. Wolfish,* 441 U.S. at 562, 99 S.Ct. at 1886. The role of the Court is to enforce constitutional standards and to protect the constitutional rights of inmates. *Ruiz v. Estelle,* 679 F.2d 1115, 1126 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Bell v. Wolfish,* 441 U.S. at 562, 99 S.Ct. at 1886. This role does not include "second-guessing prison administrators or supervising prison administration." *Ruiz v. Estelle,* 679 F.2d at 1126; *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1979). For a discussion of the importance of the role of the judiciary in ameliorating inhumane prison conditions, see *Rhodes v. Chapman,* 452 U.S. at 352–364, 101 S.Ct. at 2402–2408 (Brennan, J., concurring). The Court must not, and therefore does not, substitute its own subjective views in determining whether the conditions at F.C.I. Danbury constitute cruel and unusual punishment. The Court's judgment must be "informed by objective factors to the maximum possible extent." *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399; *Rummel v. Estelle,* 445 U.S. 263, 274–75, 100 S.Ct. 1133, 1139 (1980) (quoting *Coker v. Georgia,* 433 U.S. at 592, 97 S.Ct. at 2866).

Having set forth the general principles by which the Court is guided in determin-

ing whether an Eighth Amendment violation exists, the Court will address each of the challenged conditions not now moot, setting forth its findings of fact and conclusions of law as to whether those conditions constitute violations of the Eighth Amendment. The Court first addresses each condition of confinement separately and then considers whether the combined effect of the remaining challenged conditions violates the Eighth Amendment.[10]

### 1. *Toilet and Shower Facilities*

Plaintiffs allege that the number of showers and toilets in each living unit is insufficient to meet the basic physiological needs of the inmates living in those dorms. In its analysis of whether the numbers of showers and toilets is sufficient, the Court relies on the most recent population data supplied in the affidavit of William Ray Wood submitted June 22, 1984. As previously noted, that affidavit indicates an increase in the population of the dorms since trial.

The Court constructs the following table to show the average number of inmates in each of the units, the number of toilets and showers in each unit, and the number of inmates per toilet and shower in each unit.

**10.** At page 29 of Defendants' Proposed Conclusions of Law, defendants indicate their agreement with plaintiffs' interpretation of the law with regard to the "totality of conditions" analysis. Defendants concede that plaintiffs properly ask the Court to consider the combined effect of the challenged conditions at Danbury. The Court also agrees with plaintiffs' statement that the *Rhodes* court and most other courts have sanctioned the "totality of conditions" analysis. The court in *Rhodes* specifically stated that: "conditions other than those in *Gamble* [denial of medical care] and *Hutto* [deprivation of basic human needs, including adequate nourishment], alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities." 452 U.S. at 347, 101 S.Ct. at 2399. Most courts which have interpreted this passage have found that it sanctions the consideration of prison conditions in combination when determining whether a violation of the Eighth Amendment exists. *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.1982); *Maydun v. Thompson,* 657 F.2d 868, 874 (7th Cir.1981); *Villanueva v. George,* 659 F.2d 851, 854 (8th Cir.1981).

The Court recognizes that the Ninth Circuit in *Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir. 1982), appears to reject the totality of conditions test. That court stated that "[a] number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation." *Id.* The Court went on to say, however, that "each condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill effects of particular conditions are exacerbated by other related conditions." *Id.* The Court agrees with the Ninth Circuit that it would be insufficient to rely upon a "vague conclusion that the 'totality of conditions' violates the Eighth Amendment." *Id.* The Court also agrees that the principle focus should be on specific conditions of confinement. The Court takes issue, however, with the statement that conditions non-violative when considered separately cannot in combination amount to an Eighth Amendment violation. The Court adopts the reasoning in *Ruiz v. Estelle,* that "some conditions that might not constitute cruel and unusual punishment in some circumstances, may, in other circumstances, when combined with other conditions, rise to the level of an Eighth Amendment violation." 679 F.2d at 1140 n. 98. Finally, the Court notes that the Second Circuit stated in *Lareau v. Manson,* 651 F.2d 96, 107 (2d Cir.1981), that "[i]t is the totality [of circumstances] which the Constitution regulates." Thus, although the Court considers each challenged condition separately, it also considers the totality of conditions at F.C.I. Danbury.

| UNIT | Average Population 4/6/83– 4/25/84 | Number of Showers | Ratio of Showers to Inmates | Number of Toilets | Ratio of Toilets to Inmates |
|------|------|------|------|------|------|
| 5/O | 92 | 4 | 1:23 | 6 | 1:15 |
| 6/I | 84 | 4 | 1:21 | 6 | 1:14 |
| 7/O | 60 | -- | --- | -- | --- * |
| 10/D | 71 | 5 | 1:14 | 7 | 1:10 |
| 11/A | 72 | 3 | 1:24 | 6 | 1:12 |

* No data available for unit 7/O

The figures for numbers of toilets and showers are taken from Plaintiffs' Proposed Findings of Fact at 15 and Pl.Exs. 29, 30, 32. The number of toilets in each unit includes urinals. The Court uses the average population since the population of each unit varies. This analysis assumes that, despite the installation of cubicles, a similar number of inmates will use the toilet and shower facilities.

The above table assumes that the facilities are operable at all times. As illustrated below, the testimony at trial established, however, that some of the toilet and shower facilities were frequently inoperable and there were often long delays in having the facilities repaired and keeping them maintained. Thus, since the above figures are only accurate if all facilities are operating, and since all facilities were not always operable, on occasion there was a greater number of inmates per toilet and shower.

Inmate Vitale testified that the showers did not operate properly and "there was always one [shower] that didn't work." Inmate Deaton testified that there were many plumbing problems and delays in fixing the facilities due to difficulties in obtaining supplies. Deaton himself was a licensed plumber and the Court credits his testimony as to the plumbing problems with the toilet and shower facilities. Deaton specifically recalled one instance in which a shower in unit 10/D was turned off due to a leak in the wall.

Defendants concede that there were maintenance problems with the shower and toilet facilities and that the inmates in 9/D were forced to share their showers with inmates in 10/D when the 10/D showers were inoperable. Defendants' Proposed Findings of Fact at 76–77. Defendants argue that the maintenance delays in the main compound were merely temporary, caused by staff shortages during the construction of the camp at Danbury. Nevertheless, the Court finds that there were maintenance delays which aggravated the problems caused by the number of working toilets and showers.

Plaintiffs claim that the number of showers and toilets per inmate is insufficient to meet the inmates' basic physiological needs. They rely on the standard established by the American Correctional Association (ACA) which states that a multiple occupancy room should provide "[t]oilet and shower facilities at a minimum of one operable toilet and shower for every eight occupants." ACA standard 2–4131, Pl.Ex. 37. This standard is labeled "important" by the ACA as opposed to "essential" or "mandatory". Plaintiffs also rely on the standard established by the American Public Health Association (APHA) which provides for toilets in the ratio of one to 8 inmates in dormitory housing and showers in the ratio of one to 15 inmates. Pl.Ex. 1 at 74.

Based on the figures in the table above, Danbury clearly does not meet either the APHA standards or the ACA standards for the number of toilets and showers per inmate, with the sole exception of unit 10/D which meets the APHA standard for showers per inmate, assuming that all the showers are in working order. According to the

testimony of plaintiffs' witness, Dr. Switzer, under the ACA standard, including urinals, units 5/O, 6/I and 11/A have sufficient toilet facilities for 48 inmates and 10/D has sufficient facilities for 56 inmates. Defendants' corrections expert, Camile Camp, testified that these ACA standards should be followed.

Defendants argue that the ACA standard is based upon convenience and comfort and not on public health considerations (Mood). Since the standard is considered "important" by the ACA, defendants claim that failure to meet the standard does not indicate that the institution is unable to meet the basic physiological needs of the inmates. Plaintiffs claim that the standards establish the minimum numbers of toilets and showers necessary to ensure adequate access to the facilities.

 The Court finds that failure to meet these standards is not determinative as to whether the physiological needs of the inmates are met, but rather, it is one factor to be considered by the Court. Although the ACA and APHA standards constitute appropriate goals formulated by experts in the field, and may provide guidance for prison administrators or other branches of the government, they do not establish constitutional minima. *Rhodes v. Chapman,* 452 U.S. at 348–49, n. 13, 101 S.Ct. at 2400 n. 13; *Bell v. Wolfish,* 441 U.S. at 543–44, n. 27, 99 S.Ct. at 1876–1877, n. 27; *Lareau v. Manson,* 651 F.2d 96, 113 (2d Cir.1981) (Friendly, J., dissenting in part); *Hoptowit v. Ray,* 682 F.2d 1237, 1249 (9th Cir.1982). Therefore, defendants' failure to meet these standards does not of itself constitute a violation of the Eighth Amendment.

As plaintiffs note, the Court must look at the effect of the challenged condition upon the imprisoned. *Rhodes v. Chapman,* 452 U.S. at 362, 364, 101 S.Ct. at 2407, 2408 (Brennan, J., concurring). The inmates who testified at trial described the adverse effects created by this shortage or insufficiency of facilities. The most obvious effect was that inmates often had to wait in line to use the facilities, particularly during the busy times in the mornings and afternoons when the inmates returned from their jobs. Other effects included conflicts which arose over the limited facilities, poor personal hygiene and the increased body odor of inmates who chose not to bathe rather than wait in line. Inmates Vitale, Edwards, Deaton and Arneo testified that they had to wait in line to use the facilities.

Inmate David Michael Mizic, who was housed in unit 10/D at the time of trial, testified that he often waited from thirty to forty-five minutes during the "rush hours" to use the shower or toilet facilities at a time when 10/D housed 74 inmates. Mizic testified that the inadequate facilities in addition to the other conditions of confinement caused him severe depression. However, as defendants point out, he never requested an appointment with the psychiatrist in connection with this depression, nor did Mizic (or any other inmate) file a BP–9 or inmate complaint about the inadequacy of the facilities. (S. Miller). Mizic did testify that he did not think it would do very much good to file a complaint.

Defendants urge the Court to discredit the inmate testimony on the inadequacy of shower and toilet facilities. Defendants point to the testimony of several witnesses, including F.C.I. staff members, who said they never saw any lines in the dorms of inmates waiting to use facilities. (M.A. Wood, Coleman, Turner, Calabro, Gunnell, Grzegorek, and S. Miller). Defendants also point out that the Court, as well as many of the expert witnesses who visited Danbury, did not see inmates waiting in line to use the toilets or showers. The Court does not find this argument dispositive or even persuasive on the issue of whether in fact the inmates had to wait in line, but finds it merely fortuitous that the visits occurred at times when most inmates were out of the dorms, or were required to be present in the dorms (and not using the facilities) for a count. Even when a visit occurred during what was supposed to be a "peak" period, the fact that no lines were seen at that time does not lead to the conclusion that there never were lines. Further, one

expert witness, Dr. Paulus, specifically testified that he saw lines for the facilities during his visit to Danbury in May of 1982. Based on all the testimony, the Court finds that at least on occasion inmates were forced to wait in line.

■ The question then arises as to what harm is caused inmates who are forced to wait in line to use shower and toilet facilities. Plaintiffs argue that the harm caused by having to wait in line to use showers is that some inmates chose not to bathe, thereby increasing their body odor. They also point to the testimony of Dr. Switzer that poor personal hygiene has a debilitating effect on inmates. Despite these arguments, the Court finds no real harm in being forced to wait in line to use the showers.[11] This is merely an inconvenience which may be considered as part of the penalty criminal offenders pay for their offenses against society. *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399.

With regard to the potential harmful effects on inmates of being forced to wait to use toilet facilities, plaintiffs' witness Dr. Bailus Walker testified that the inability or lack of facilities to discharge adequately bodily wastes could have adverse health effects, particularly on older inmates. Dr. Walker stated that "the inability to discharge urine may cause a distortion of the bladder. It may increase the probability of infection in the bladder." (Walker TR at 76–77).[12]

Defendants' witness Dr. Eric Mood testified to the contrary that it is not unhealthy to have to wait to use the toilet and that being forced to wait does not constitute a denial of a basic physiological need.

■ On the record in this case, the Court finds that although plaintiffs were in fact often forced to wait, there is no specific evidence of significant adverse health effects caused by waiting to use toilet facilities. The Court acknowledges that waiting may have adverse health effects on certain older inmates. (Walker, TR at 130). However, plaintiffs have not introduced any medical records or verification of any such problems.

The Court's inquiry is limited by *Rhodes v. Chapman* to determining whether the prison conditions "result in unquestioned and serious deprivation of basic human needs" or "deprive inmates of the minimal measure of life's necessities." 452 U.S. at 347, 101 S.Ct. at 2399; *Holloway v. Gunnell*, 685 F.2d 150, 155 (5th Cir.1982). The toilet facilities at F.C.I. Danbury are not at all like those at the California state prison found unconstitutional in *Toussaint v. McCarthy*, 597 F.Supp. 1388 (N.D.Ca.1984). In that case, inmates experienced serious problems of toilets that did not flush, leaking toilets, wet floors and water shutdowns. Defendants there admitted that they considered requiring prisoners to "use covered chamber pots." *Toussaint v. Rushen*, 553 F.Supp. 1365, 1372 (N.D.Ca. 1983). Further, there were rodents, insects, dirt and excrement in the inmates' cells. *Id.* Conditions in the bathroom areas at Danbury are in no way comparable to the conditions found unconstitutional in *Toussaint*. In fact, plaintiffs do not challenge the sanitary conditions of the toilet and shower facilities, but only the number of toilets and showers. Plaintiffs cited no case law in support of their theory that the number of toilets and showers is constitutionally inadequate, but rely only on the ACA and APHA standards and the "standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*,

---

11. The Court notes that most Eighth Amendment claims challenging showers in correctional institutions challenge restrictions on the number of showers inmates are allowed per week. *See Holloway v. Gunnell*, 685 F.2d 150, 156 n. 6 (5th Cir.1982), and cases cited therein. Generally, one or two showers per week has been held sufficient to satisfy constitutional requirements. *Id.* In this case, however, there is no evidence of any institutional restriction on the number of showers allowed inmates in the general population at F.C.I. Danbury.

12. Other notations to testimony do not refer to a transcript since the Court was not provided with a transcript for most of the proceedings in this case. A transcript was provided of Walker's testimony, however, and the court refers to that transcript as TR.

452 U.S. at 346, 101 S.Ct. at 2399. *See* Plaintiffs' Proposed Conclusions of Law Nos. 10, 11.

The record establishes that it may be uncomfortable and inconvenient for inmates to have to wait and that being forced to wait routinely may lead to poor personal hygiene, stress, increased body odor, and conflicts over limited facilities. However, the Court finds that the evidence concerning shower and toilet facilities, including the failure to meet the ACA and APHA standards designed to ensure adequate access to facilities, does not establish that F.C.I. Danbury is unable to meet the inmates' basic physiological needs. Therefore, the shower and toilet facilities challenged by plaintiffs do not constitute a violation of the Eighth Amendment.

2. *Sanitation & Food Service*

Plaintiffs also challenge the sanitation at F.C.I. Danbury. The main area of complaint in this regard is the food service area and food preparation and storage facilities. Plaintiffs introduced testimony at trial which establishes beyond question that at least on occasion there was insect infestation at Danbury. Defendants do not contest this and in fact defendants' witness, Mr. Madden, Duty Officer and Safety Manager at Danbury, conceded that on two occasions there were maggots in certain equipment in the kitchen and dining area. Further, defendants concede that weevils were found in a batch of rice in the summer of 1982. *See* Defendants' Proposed Findings of Fact at 81.

Ms. Susan Zaborowski, a public Health Inspector for the City of Danbury, testified that she inspected the institution approximately every three months beginning in December of 1981. At least on one inspection in April of 1982 she noted signs of rodents and insect infestation and started extermination proceedings. Ms. Zaborowski testified that the presence of rodents and insects at such institutions is not unusual. She further testified that Mr. Madden was cooperative and followed her suggestions to ensure compliance with health codes and sanitary regulations. *See* Def.Ex. 527, Letter to Mr. Madden from Zaborowski dated December 27, 1982. Zaborowski stated that "the majority of violations have been corrected, replaced or on order." She lists minor violations noted during her inspection on December 17, 1982 and commends the F.C.I. staff for "their continuous improvements in bettering the status of the kitchen facility." Def.Ex. 527.

Plaintiffs point to the memorandum written by Mr. Madden to Warden Gunnell as evidence of the unacceptable level of sanitation. Pl.Ex. 120, Memorandum dated July 13, 1982. This memorandum cites numerous problems with sanitation and safety at Danbury, particularly in the food preparation and service areas. The Zaborowski letter, however, indicates that most of these problems or health code violations were corrected at least by December of 1982, if not earlier.

 Therefore, the Court finds that although Danbury was in violation of certain health codes, the majority if not all of the violations have been corrected. The Court finds that the F.C.I. has taken steps to control any insect infestation or rodent problems which are not unusual to such large institutions. Thus, although plaintiffs claim that the sanitation level at Danbury presents an obvious health and safety hazard to the inmates, the Court disagrees.

 Dining-related Eighth Amendment claims should be addressed to the quantity or quality of essential food. *Walker v. Johnson*, 544 F.Supp. 345, 359 (E.D.Mich.1982), *citing Rhodes v. Chapman*, 452 U.S. at 348, 101 S.Ct. at 2400. Although plaintiffs here challenge the sanitation of the food service facility, they do not claim a basic deprivation of food. *Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980), sets forth the constitutional minimum as to prison food: "[The state must provide] nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume

it." *Id.* at 570–71. Serious sanitation problems in food service and preparation areas could certainly rise to the level of an Eighth Amendment violation under this standard. *See Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Grubbs v. Bradley,* 552 F.Supp. 1052, 1123 (M.D.Tenn. 1982). In the instant case, however, given the correction of any health code violations, the sanitation problems in the food service area identified by plaintiffs are not such that the food prepared at Danbury presents an immediate danger to the inmates who consume it. Therefore, the Court finds that the challenged sanitation and food service conditions do not violate the Eighth Amendment.

### 3. *Physical Exercise & Recreation Facilities*

Plaintiffs allege that F.C.I. Danbury does not provide inmates adequate access to physical exercise. They allege that the facilities available are so heavily used and overcrowded that conflicts arise and inmates are ultimately forced to forego use of the facilities and the physical exercise for which they have a basic need.

Mr. Rotunda, the recreation supervisor at Danbury, described the facilities available. They include a gymnasium, an outdoor exercise yard and a "leisure area". The leisure area consists of a pool room, music room, arts and crafts room, a card room, and weightlifting equipment. These facilities are open on an alternating basis in the afternoons and evenings. *See* Def.Ex. 524. The schedule of available facilities also varies from summer to winter. The outer exercise yard is not open in the winter. However, the inner compound containing a jogging track and basketball, bocce, horseshoes and handball facilities is open year round and is available to the inmates except during lockdown. The inner compound is generally open for use by the inmates 14 hours a day.

Although several inmates including Arneo, Deaton and Edwards, testified to the crowded recreation facilities, Mr. Rotunda stated that he received no significant inmate complaints about access to the facilities. Indeed, he testified that he did not receive any such complaints from inmates Arneo, Deaton, or Edwards.

Plaintiffs contend that there is insufficient staff to keep the recreation facilities open often enough to provide inmates with an adequate opportunity for physical exercise. Plaintiffs claim that opening the facilities on an alternating basis deprives inmates of their constitutional right to physical exercise.

Many courts have recognized a constitutional right to physical exercise. *Ruiz v. Estelle,* 679 F.2d at 1152; *Campbell v. Cauthron,* 623 F.2d 503, 507 (8th Cir.1980); *Spain v. Procunier,* 600 F.2d 189, 199–200 (9th Cir.1979); *Laaman v. Helgemoe,* 437 F.Supp. 269, 309 (D.N.H.1977). *Ruiz v. Estelle,* 679 F.2d at 1152, held that a court must determine an inmate's need for exercise by reference to the size of his cell, the amount of time he spends locked in his cell each day, and the overall duration of his confinement. *Id.* In *Ruiz,* the inmates who claimed an unconstitutional deprivation of physical exercise were inmates in a maximum security prison in administrative segregation. That court found that under circumstances where two inmates could be confined in a forty-five square foot cell too small to permit any real exercise, for almost twenty-four hours a day, the district court acted within its discretion in prescribing that each inmate must be afforded the opportunity for at least one hour of exercise a day if he is in administrative segregation for more than three consecutive days. *Id.*

█ A consideration of the *Ruiz* factors here compels the conclusion that there is no unconstitutional deprivation of the inmates' rights to physical exercise at Danbury. Unlike the inmates in *Ruiz,* the inmates at Danbury are required to spend relatively little time in their living units. Most of the inmates in the general population at Danbury work during the day, eat their meals in the dining area and are only required to be in their living units during the afternoon count and at night.

The other cases cited by plaintiffs which find unconstitutional deprivations of physical exercise are similarly distinguishable. *Spain v. Procunier*, 600 F.2d 189, found an unconstitutional deprivation of physical exercise where inmates assigned to an adjustment center were locked down for virtually 24 hours a day, and were allowed "only meager out-of-cell movements and corridor exercise". *Id.* at 199. In *Campbell v. Cauthron*, 623 F.2d 503, the court found that "merely allowing the inmates to walk around in the narrow corridor between cells does not provide adequate exercise." *Id.* at 507. The remedy in Campbell provided that each inmate confined to his cell for more than sixteen hours a day be given the opportunity to exercise for at least one hour per day outside the cell. *Id.* On the record before the Court, plaintiffs have not established that they are deprived of the right to physical exercise to the extent required for a finding of cruel and unusual punishment.

Inmates at Danbury can satisfy their basic need for physical exercise by using the inner compound even when particular equipment is unavailable due to overcrowding or restricted hours of use, or when the outer yard is closed. Thus, inmates have certain forms of exercise available with enough regularity to meet their basic needs. The Court thus finds no constitutional deprivation of the right to physical exercise.[13]

### 4. *Fire Safety & Staffing*

Plaintiffs also challenge the adequacy of fire safety and evacuation procedures. They claim that the staff shortage prevents correctional officers from responding quickly enough to evacuate the inmates from the dorms in the event of a fire.

Defendants' witness Mr. Wayne Carson testified to the status of fire safety measures at Danbury. He stated that for the most part Danbury was in compliance with the Life Safety Code. Pl.Ex. 96. The only violation he discussed was that relating to the door from the laundry room located underneath unit 10/D. According to the Code, there should be a one hour fire resistant door in the exit from the laundry or, in the alternative, automatic sprinklers should be installed in the laundry room. Carson testified, however, that the inmates were not exposed to an unreasonable risk of death or fire and were not in imminent danger, at least no greater than that which exists in a typical private residence.

Plaintiffs' central challenge of the fire safety conditions at Danbury is not that Danbury is in violation of fire safety regulations, but rather that the institution is understaffed preventing swift response in case of fire. Plaintiffs focus upon the lack of continuous supervision of the dormitories during the night, particularly between the hours of midnight and 6:30 a.m. at which time the doors to the unit are opened for the day. The F.C.I. policy is to assign one correctional officer to patrol two units during that time and plaintiffs' concern appears to be that a fire could begin in a dormitory when no correctional officer is present. Further, plaintiffs point out that the correctional officer does not carry a key to the exterior doors.

For security reasons and for the safety of the correctional officer, the correctional officer, working alone, does not carry a key to the exterior door, but the correctional officer does carry a key to an exit from the dorm permitting evacuation into adjoining units. The yard officer, the lieutenant and a physician's assistant are the only three people with keys to the exterior door be-

---

**13.** In making its findings with regard to recreation, the Court does not diminish the importance of exercise and recreation. *See Ruiz v. Estelle*, 679 F.2d at 1152; *Campbell v. Cauthron*, 623 F.2d at 507; *Spain v. Procunier*, 600 F.2d at 199–200. The importance of the use of the yard and outdoor exercise to the inmates is illustrated by the incident of April 20, 1980. On that date, the failure to open the yard led to a group demonstration among the inmates. Apparently the inmates felt the yard should have been opened, but it was kept closed for safety reasons due to a wet playing field. The record indicates that the demonstration was peaceful and was not repeated.

tween the hours of midnight and 4:00 a.m. At all times during those hours there is someone with an exterior door key within a few hundred yards who could reach the dorm quickly in the event of a fire or some other emergency.

Additionally, Carson testified that any risk of fire to the inmates, or injury by fire is not related to the population levels in the dorms. Even at the highest population levels, the dorms were well within the population capacity limit for one smoke compartment as determined by, among other factors, the number and size of exit doors.

Lastly, the F.C.I. is inspected on a regular basis by the City of Danbury Fire Department. *See* Def.Ex. 536. As a result of these inspections, violations of the Connecticut State Fire Safety Code were brought to the attention of Mr. Madden, safety officer at Danbury. *See* Def.Exs. 537, 538, 539, 540. Defendants' exhibit 539 indicates that steps were taken to correct any reported violations. The inspection reports also indicated that there were "no violations of travel distance requirements and evacuation plans were properly posted in all areas." Def.Ex. 537, 538, 540.

Defendants unquestionably have a duty to provide adequate fire safety for the inmates at Danbury. *Ruiz v. Estelle*, 679 F.2d at 1153. *See Leeds v. Watson*, 630 F.2d 674, 675–76 (9th Cir.1980); *Dimarzo v. Cahill*, 575 F.2d 15, 16, 19 (1st Cir.), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978).

In *Ruiz v. Estelle*, the Court of Appeals for the Fifth Circuit vacated the district court's finding that the fire safety conditions violated the Eighth Amendment. The district court had ordered the Texas Department of Corrections to "comply with the current edition of the Life Safety Code of the National Fire Protection Association." The Court of Appeals found that the conditions did not constitute cruel and unusual punishment and that the standards set by private organizations' safety codes, although instructive, do not establish constitutional minima. 679 F.2d at 1153.

■ Similarly, in the case at bar, the Court recognizes that the laundry room door represents a violation of the Life Safety Code, Pl.Ex. 96, but finds that that violation does not constitute an Eighth Amendment violation.[14]

In *French v. Owens*, 538 F.Supp. 910 (S.D.Ind.1982), the Court found the defendant Indiana prison officials in violation of Indiana state fire laws and regulations. Typical violations at the Indiana Reformatory were described by the court as follows:

... the school building, all three dormitories, all three cellhouses, the infirmary, the field house and the second floor of the officers' quarters all require a fire alarm system with interconnected smoke detectors; a second egress is required from the library, certain classrooms, both floors of the dormitories, all cellhouses, the second floor of the officers' quarters, and from dead end corridors in the infirmary; spray booths in three of the furniture factories and the auto body shop do not meet standards, nor do the paint storage areas. Many more deficiencies exist.

*Id.* at 921. The fire safety conditions at Danbury are not nearly as deficient as the conditions at the Indiana Reformatory.

Thus, on the record in this case, the Court finds that the plaintiffs have not established that the fire safety provisions at Danbury are inadequate so as to deprive plaintiffs of their constitutional rights. Further, the staffing pattern during the night does not create an unconstitutional risk of harm to the inmates.

---

14. Although the Court finds that this code violation does not amount to a constitutional violation, the Court emphasizes the seriousness of the code violation. A reminder of the history of the institution in the area of fire safety is sufficient to apprise defendants here of the potential loss and tragedy created by inadequate fire safety procedures. *See Blue, et al. v. United States of America, (In re* Consolidated Danbury Fire Cases), Civ. Action No. B–78–210, slip op. (D.Conn. May 11, 1981).

Plaintiffs also claim that the staffing at Danbury is inadequate to ensure inmate safety in general. In considering the general safety of the inmates, the Court finds the situation at Danbury far superior to that found unconstitutional at the Indiana State Reformatory in *French v. Owens,* 538 F.Supp. 910, where the court found that overcrowding led to a marked increase of serious violence including stabbings, bludgeoning and homosexual rapes, some of which resulted in fatalities. *Id.* at 922.

■ Although the inmates testified that the overcrowding at Danbury led to increased tension among inmates, including, for example, occasional arguments over limited recreation facilities, the evidence shows that violence at Danbury is infrequent. In contrast to many of the institutions found not to provide adequate safety for inmates, Danbury is not a maximum security prison. A review of the monthly reports of assault data from January, 1978 through December, 1982 indicates a relatively low assault rate. Pl.Ex. 51. None of the inmates who testified stated that they were in fear for their own physical well being or afraid of attack from other inmates. The inmates indicated that they were unafraid even at night when no correctional officer was present in the dormitory.

Therefore, while increased staff may be highly desirable, the Court finds that the number of staff members and the staffing pattern at Danbury does not constitute cruel and unusual punishment in violation of the Eighth Amendment.

### 5. *Female Staff Members in the Living Units*

Plaintiffs also allege that the unannounced presence of female correctional officers in the dormitories and toilet and shower areas invades inmate privacy since it allows for or results in female staff occasionally viewing inmates undressed or engaged in other personal activities. Defendants concede that female guards enter the dorms unannounced, but claim that this is proper correctional procedure and random inspections are necessary to detect illicit activity.

Defendants claim that "plaintiffs have never challenged the assignment of female correctional officers to units containing cubicles or cells, or the unannounced entry of female correctional officers into those units." Defendants Proposed Conclusions of Law at 28 n. 4. This assertion might suggest that plaintiffs' claim of a constitutional violation of the right to privacy is moot since the open dormitories have been converted into cubicled housing units. However, the Court considers this claim because plaintiffs allege that female correctional officers view male inmates using the toilet and shower facilities. Since the bathroom area is separate from the sleeping area of the dorms, it is conceivable that if the practice of viewing male inmates engaged in personal activities exists to the extent that it constitutes a violation of the inmates' privacy rights, the practice could continue despite the installation of cubicles. Of course, the installation of cubicles makes plaintiffs' request for a screened-off dressing area in the dorms to prevent female guards from viewing male inmates while dressing moot.

■ In considering whether the inmates' rights to privacy have been violated, the Court finds that female correctional officers occasionally saw an inmate unclothed or using the shower or toilet facilities. However, this occurred only rarely even though the female guards routinely entered unannounced. The evidence established that inmates are usually aware when a female guard is present and they generally have time to respond. Further, inmates are required by institution policy to remain clothed at all times except while dressing or using the bathroom facilities.

Only one inmate complaint was filed in this regard and it was filed by an inmate not housed in one of the challenged units. Def.Ex. 504. That incident involved a female guard entering the shower room while an inmate was showering. The inmate was upset and embarrassed by the

incident. However, the inmate was showering while the count was in progress and was, therefore, in violation of institutional regulations. *Id.*

The Court credits the testimony of those witnesses who stated that it is proper correctional procedure for female guards to enter the housing units unannounced. Testimony of Carlson, Grzegorek, Camp, Gunnell, Coleman, Wood. For the following reasons, the Court finds that the unannounced presence of female guards does not amount to a violation of the constitution.

 It is well settled that there is a constitutional right to privacy. *Carey v. Population Services Int'l*, 431 U.S. 678, 684–86, 97 S.Ct. 2010, 2015–2016, 52 L.Ed.2d 675 (1977); *Roe v. Wade*, 410 U.S. 113, 152–56, 93 S.Ct. 705, 726–728, 35 L.Ed.2d 147 (1973). Although convicted prisoners forfeit some of their constitutional protections, they do not forfeit all of their constitutional rights by reason of their conviction and confinement. *Bell v. Wolfish*, 441 U.S. at 545, 99 S.Ct. at 1877; *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir.1982). The constitutional right to privacy may be restricted to the extent necessary to further the penal institution's legitimate goals or policies, including the need to maintain security, *Bell v. Wolfish*, 441 U.S. at 546, 548, 99 S.Ct. at 1877, 1879; *Cumbey v. Meachum*, 684 F.2d at 714, but the right to privacy does not "vanish altogether." *Id.* Those cases which have found a violation of inmates' rights to privacy have looked to the frequency or regularity of such "viewing". As a general rule, courts have found a violation only in those cases in which guards "regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities or showering." *Id. See Dawson v. Kendrick*, 527 F.Supp. 1252, 1316–17 (S.D.W.Va.1981); *Bowling v. Enomoto*, 514 F.Supp. 201 (N.D.Ca.1981); *Hudson v. Goodlander*, 494 F.Supp. 890 (D.Md.1980); *Forts v. Ward*, 471 F.Supp. 1095 (S.D.N.Y.1979), *vacated in part*, 621 F.2d 1210 (2d Cir.1980).

The court finds that the evidence in the instant case establishes that female guards have only occasionally viewed male inmates undressed or using the shower and toilet facilities. The Court finds no indication that female guards at Danbury regularly view male inmates in violation of their privacy rights. Plaintiffs cite *Forts v. Ward*, 621 F.2d 1210, for the proposition that "[t]he constitution requires the prison to provide 'adequate protection to the privacy of the inmates by means that will avoid any denial of the guards' right to equal employment.'" Plaintiffs' Proposed Conclusions of Law at 11–12. Although this is a correct reading of *Forts*, the Court does not believe that the proposition advances plaintiffs' claim that the privacy rights of inmates at Danbury are violated by the presence of female guards in the housing units. As defendants point out, the *Forts* case is markedly different from the instant case since in *Forts* the State of New York conceded that the nighttime viewing of completely or partially unclothed women inmates by male guards regularly occurred as a result of the assignment of male guards to nighttime corridor patrols in female cellhouses. The Court of Appeals for the Second Circuit did not address the question of whether the inmates' rights were violated, but examined only the necessity of the remedy ordered by the district judge which infringed on the guards' employment rights. *Forts v. Ward*, 621 F.2d at 1216–17.

 The Court finds that *Forts v. Ward* merely emphasizes that in order for inmates to show a violation of their privacy rights, they must show that the "viewing" by guards of the opposite sex occurs on a regular basis. Plaintiffs have not made the required showing. Therefore, the Court finds no violation of the inmates' rights to privacy.

### 6. *Totality of Conditions*

 Having considered each of the challenged conditions not now moot and finding that they do not individually constitute cruel and unusual punishment, the

Court also finds that those conditions in combination do not amount to a violation of the Eighth Amendment.

In reaching this conclusion, the Court considered the effect of all the challenged conditions upon the inmates. On the record in this case, the Court cannot find that inmates at Danbury are deprived of a minimal civilized measure of life's necessities. *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399. Under contemporary standards of decency, the Court cannot find that the conditions of confinement fail to comport with human dignity. The record establishes that the inmates are provided with food, clothing, shelter, sanitation and personal safety. *Lareau v. Manson*, 651 F.2d at 106. Thus, the basic needs of the inmates are met. Inmates at Danbury are not subjected to unnecessary and wanton inflictions of pain or pain "totally without penological justification." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399.

The Court recognizes that Danbury is severely overcrowded. The conditions of confinement are not ideal and in some respects they are unquestionably unpleasant and even harsh. However, overcrowding *per se* does not amount to a constitutional violation. Overcrowding within the federal prison system is a serious and complex problem which has reached critical proportions. However, as the Supreme Court stated in *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, the problems of prisons in America are not readily susceptible of resolution by decree. Resolution of the problems of overcrowding requires "expertise, comprehensive planning and the commitment of resources all of which are peculiarly within the province of the legislative and executive branches of government." *Id.* Therefore, although the Court acknowledges the shortcomings of the conditions at Danbury, its Eighth

Amendment inquiry is limited by the principles of law set *forth above.*

For the foregoing reasons, the Court finds that the conditions of confinement at F.C.I. Danbury as they existed at the time of trial do not constitute cruel and unusual punishment in violation of the Eighth Amendment.

The consolidated claim of Michael Heymann will be treated in a separate ruling.

### RULING ON DEFENDANTS' MOTION TO DISMISS

Plaintiffs' Second Amended and Substituted Complaint seeks ten million dollars in damages from the defendants pursuant to the Federal Torts Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.* for personal injuries allegedly caused by the defendants' negligent confinement of the inmates incarcerated at the Federal Correctional Institution at Danbury, Connecticut. After having made a determination on the injunctive claim, the Court now reaches the FTCA claim. Defendants moved to dismiss plaintiffs' claim for damages under the FTCA on the ground that the Notice of Claim filed with the Bureau of Prisons was insufficient to satisfy the jurisdictional requirements of 28 U.S.C. § 2675. For the reasons set forth below, the defendants' motion to dismiss is GRANTED.

Counsel for plaintiffs filed an administrative claim in the form of a letter to Norman Carlson, Director of the Bureau of Prisons dated July 3, 1980 written on behalf of all persons confined at F.C.I. Danbury setting forth the grounds for their assertion that the government was negligent in its confinement of the plaintiff class of inmates. The letter informed the government that the class sought ten million dollars in damages under the FTCA. Given the significance of this letter, as plaintiffs' only filing with the Bureau of Prisons, the entire text of the letter is set forth in the footnote.[1]

---

1. The letter reads as follows:

Mr. Norman Carlson
Director of Prisons
Department of Justice
Washington, D.C. 20534

Re: *Lareau et al vs. United States of America, et al*
Dear Mr. Carlson:
This letter is to inform you that as counsel on behalf of all persons confined at the Federal Correctional Institution at Danbury, Connecti-

On July 16, 1980, plaintiffs moved for leave to amend their complaint to include a claim under the FTCA. Leave was granted by the Court on October 6, 1980 and the Amended and Substituted Complaint was filed the same day. Although the filing of suit on the FTCA claim was clearly premature under section 2675(a)[2], the Court does not dismiss the claim on this ground since a Second Amended and Substituted Complaint was subsequently filed after the expiration of the six month period.

Based on the affidavit of David R. Essig, Regional Counsel for the Northeast Region, Bureau of Prisons, general counsel acknowledged receipt of this letter by a return letter dated July 30, 1980 and asked counsel to file the claim for damages on Standard Form 95.[3] Plaintiffs concede that they never responded to the letter of July 30. On February 13, 1981, Mr. Z. Stephen Grzegorek, Regional Director, wrote to plaintiffs' counsel advising them that the purported claim was "insufficient in its present form". Mr. Grzegorek asked plaintiffs' attorneys to provide the Bureau of Prisons with the information required under 28 C.F.R. §§ 14.3 and 14.4 regarding their authorization to represent the plaintiff class and seeking specific information concerning the alleged personal injuries including medical and psychiatric reports. Mr. Grzegorek informed counsel that the Bureau of Prisons would not consider the administrative claim without the requested information. Plaintiffs again failed to respond in any way.

Defendants argue that the plaintiffs should not be permitted to maintain their suit for damages under the FTCA in the district court based on the insufficiency of the notice of claim. The Court of Appeals for the Second Circuit has ruled that "the requirement that a notice of claim be filed is jurisdictional and cannot be waived." *Keene Corp. v. United States*, 700 F.2d 836, 841 (2d Cir.1983), *cert. denied*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

Defendants contend that the notice of claim is defective in four ways: 1) the letter does not state a sum certain for the damages claimed by any individual member of the class, 28 U.S.C. § 2675(b); 28 C.F.R. § 14.2; 2) it does not provide the names of the class members purportedly represented

cut, we intend to bring a claim against the United States, pursuant to the Federal Tort Claims Act 26 [sic] U.S.C. § 2671 et seq.
The basis of this claim is that throughout the period July 1979 and continuing to the present time, the defendants and their employees, agents and servants were negligent in the confinement of the plaintiffs and failed to render the plaintiffs custodial care in one or more of the following ways:
1. In failing to provide adequate living space within which to sit, eat, exercise or sleep;
2. In failing to reduce the inmate population within manageable limits;
e. [sic] In failing to provide the proper facilities and services to the inmates; and
4. In failing to comply with the regulations, policies and guidelines for population space as promulgated by the United States Bureau of Prisons.
As a result of the negligence of the defendants, the plaintiffs have suffered and will continue to suffer physical discomfort and permanent psychological distress and injury and the plaintiffs have not been able to engage in an effective program of correctional rehabilitation.
The amount of the claimed damages for the inmates are [sic] TEN MILLION ($10,000,000.00) DOLLARS.

A copy of this letter is being sent directly to the United States Attorney for the District of Connecticut.
\* \* \* \* \* \*

**2.** 28 U.S.C. § 2675(a) provides in part:
An action shall not be instituted upon a claim against the United States ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

**3.** Claimants are not required to state their claims on a Standard Form 95; a letter can be sufficient so long as it complies with the other requirements of filing a Notice of Claim. 28 C.F.R. § 14.2 specifically provides for the use of a "Standard Form 95 or other written notification...." *Id. See Crow v. United States*, 631 F.2d 28, 30 (5th Cir.1980) ("neither a Form 95 nor any other particular form of claim is required ...").

by the named plaintiffs and their attorneys; 3) the notice did not provide evidence of the authority of the named plaintiffs or their attorneys to represent the unnamed class members in bringing their tort claims, 28 C.F.R. § 14.3; and 4) the notice provided no evidence or information in support of the claim such as medical, psychological or psychiatric records establishing the alleged injuries, 28 C.F.R. § 14.4. Defendants essentially take the position that plaintiffs are required to satisfy the provisions of the regulations promulgated pursuant to 28 U.S.C. § 2672 in order to satisfy the notice of claim requirements under the FTCA and establish jurisdiction in the district court.

Plaintiffs contend in response that the notice of claim satisfied the statutory requirements of 28 U.S.C. § 2675 and that it is unnecessary to comply with the regulations under 28 C.F.R. §§ 14.3 and 14.4 in order to file an adequate notice of claim. Plaintiffs assert that the regulations contained in 28 C.F.R. § 14.1 *et seq.* govern settlement procedures and do not set federal jurisdictional prerequisites.

■ The Court initially notes that there are no provisions in the FTCA or the regulations promulgated thereunder for filing class action administrative claims against the United States. *See Caidin v. United States,* 564 F.2d 284, 287 (9th Cir.1977); *Pennsylvania v. National Assoc. of Flood Insurers,* 520 F.2d 11, 23 (3d Cir.1975). Although some courts have questioned whether a class action is maintainable at all under the FTCA, *see e.g., Caidin v. United States,* 564 F.2d at 287; *Kantor v. Kahn,* 463 F.Supp. 1160, 1164 (S.D.N.Y.1979), the Court is of the opinion that the FTCA implicitly allows for the filing of class actions since it provides that the United States shall be liable for torts in the same manner and to the same extent as a private individual. 28 U.S.C. § 2674.[4]

The Second Circuit specifically left open the question whether "the administrative

filing requirements of Section 2675—which are jurisdictional in nature—should be read in the light of regulations issued under 28 U.S.C. § 2672...." *Keene Corp. v. United States,* 700 F.2d at 841. The Court of Appeals noted that the circuits are split on this issue, but found it unnecessary to decide the issue in *Keene. Id.* at 841 n. 9. Notably, the Fifth and Sixth Circuits have ruled that the regulations do not apply to Section 2675 and the question whether a plaintiff has provided the requisite Section 2675 notice is determined without reference to whether a plaintiff has complied with all settlement related requests. *Adams v. United States,* 615 F.2d 284, 288 (5th Cir. 1980); *Martinez v. United States,* 728 F.2d 694 (5th Cir.1984); *Douglas v. United States,* 658 F.2d 445, 447–48 (6th Cir.1981). Other circuits, and district courts within the Second Circuit, have applied the regulations to Section 2675 and have found that failure to comply with the regulations requires dismissal of the action on jurisdictional grounds. *Caidin v. United States,* 564 F.2d 284; *House v. Mine Safety Appliance Co.,* 573 F.2d 609 (9th Cir.1978); *Lunsford v. United States,* 570 F.2d 221, 225 (8th Cir.1977); *Pennsylvania v. National Assoc. of Flood Insurers,* 520 F.2d at 19–20; *Rogers v. United States,* 568 F.Supp. 894 (E.D.N.Y.1983); *Johnson v. United States,* 594 F.Supp. 728 (E.D.N.Y. 1984); *Kantor v. Kahn,* 463 F.Supp. 1160; *Luria v. Civil Aeronautics Board,* 473 F.Supp. 242, 244 (S.D.N.Y.1979). *But see Blue v. United States,* 567 F.Supp. 394 (D.Conn.1983). *See generally* 48 A.L.R. Fed. 860 (1980).

Regardless of whether the regulations apply, the Second Circuit stated in *Keene Corp. v. United States* that, despite the conflict among the circuits on other requirements, "courts seem agreed that the statement of damages in any Notice of Claim must contain a sum certain." 700 F.2d at 841–42 (citing *Adams v. United*

---

**4.** 28 U.S.C. § 2674 provides in pertinent part:
 The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a

private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

*States,* 615 F.2d at 291 n. 15). *See Kantor v. Kahn,* 463 F.Supp. at 1164; *House v. Mine Safety Appliance Co.,* 573 F.2d at 615. The court dismissed Keene's claim for failure to state a sum certain in damages. The court noted that section 2675, in conjunction with section 2672, is designed to "provide a procedure under which the government may investigate, evaluate and consider settlement of a claim." *Id.* at 842. In *Keene,* the plaintiff claimed "damages in the sum of $1,088,135 and in an additional amount yet to be determined." *Id.* at 841. The reservation as to future damages rendered plaintiff's claim so indefinite that the statutory purpose of enabling government officials to evaluate the claim with a view to settlement could not possibly have been effectuated. *Id.* at 842.

Furthermore, since Keene sought contribution or indemnification from the U.S. Government on a number of asbestos related claims which had been filed against the corporation, Keene's notice of claim was deficient because it failed to specify the amount it demanded for each underlying lawsuit; it merely provided the government with a list of case names and docket numbers. Citing *Kantor v. Kahn,* 463 F.Supp. at 1164, the Court of Appeals stated that "where separate claims are aggregated under the FTCA, the claimant must present the government with a definite damage amount for each claim." *Id.*

▆▆▆▆ Although *Keene* was not a class action case, the decision clearly requires that, at a minimum, the sufficiency of any notice of claim must be considered in light of the statutory purpose of creating a procedure whereby the government can investigate, evaluate and consider settlement of a tort claim against it. Indeed, given the Second Circuit's reliance on *Kantor v. Kahn,* the decision can fairly be interpreted as requiring that a notice of claim in class actions place a value on each class member's claim. In *Kantor v. Kahn,* plaintiff class of consumers sought to bring suit against the United States for the failure of the Civil Aeronautics Board to regulate a charter tour group. 463 F.Supp.

1160. Plaintiffs' notice of claim demanded $50,000,000 on behalf of "as many as 500,000 consumers." Plaintiffs in *Kantor* contended that they satisfied the sum certain requirement since the demand could be interpreted to equal $100 per consumer; although the plaintiffs actually represented only 40,000 consumers, the plaintiffs argued that the $100 figure could still apply. The court rejected this argument finding that "there is nothing in the Notice of Claim which indicates that each consumer suffered the same damage. Rather, plaintiffs' allege in their complaint that members of the class participated in various tours offered by Nationwide." *Id.* at 1164.

The plaintiffs argue that it was sufficient to state the total class claim of ten million dollars. Plaintiffs rely on the Eighth Circuit's decision in *Lunsford v. United States,* 570 F.2d 221, which indicated that a notice of claim in a class action need only state the total amount of the claim for the entire class. *Id.* at 227. Despite the holding in *Lunsford,* several cases have required more than a general statement of the total amount of damages suffered by the class. *Kantor v. Kahn,* 463 F.Supp. 1160; *Caidin v. United States,* 564 F.2d at 287 ("the sum certain requirement demands more than a general notice to the government of the approximate amount of a claim").

In the instant case, while plaintiffs' notice of claim did allege a total amount of damages for the entire class, there is no breakdown of the different members' claims and there is nothing in the notice that indicates that the inmates suffered injuries to the same degree. As the Court noted in its Memorandum of Decision of June 27, 1985, plaintiffs conceded that only the conditions in certain housing units were at issue; this concession implies that the conditions were worse in some units than in others. If plaintiffs were successful on their FTCA claim, it would appear that the inmates housed in the challenged units for longer periods of time would have suffered greater injury and those who were never housed in those units could conceivably

have suffered no injury at all. The notice of claim, however, described none of the units. The notice was filed on behalf of the entire inmate population at Danbury which unquestionably leaves room for great disparity within the class as to the injuries claimed. Thus, since the government could not ascertain the value of each class member's claim, the notice was insufficient under *Keene*.[5]

The *Keene* court also found plaintiff's notice of claim inadequate for failure to "provide sufficient information regarding the nature and merits of Keene's claim so far as liability is concerned. The burden is on the claimant to provide this information...." *Id.* Thus, although the court expressly declined to require compliance with Section 2672 regulations in order to meet the notice requirements of Section 2675, the court did require a statement of a sum certain and more specific information regarding the merits of Keene's claim in order to enable the government to decide whether to litigate or to settle the claim.

Although the Court has already determined that plaintiffs notice of claim is deficient for failure to place a value on each member's claim, the Court finds that plaintiffs also failed to satisfy this second prong of the *Keene* decision. Although plaintiffs did provide some information regarding the merits of their claim, the Court finds that it was insufficient to enable the government to determine whether to settle or litigate the claim. The insufficiency of the information is illustrated by the government's request for further information. Although this request was made pursuant to the administrative regulations, and the Court does not here specifically find that the regulations apply, the Court is of the opinion that the request indicates that the government felt it needed more information to evaluate its liability.

The Court has already noted that the question of whether the regulations prom-

ulgated under section 2672 must be satisfied in order to comply with the notice of claim requirements of section 2675 has not been decided by the Court of Appeals for the Second Circuit. In the event the regulations should apply, and without deciding that question, the Court finds that plaintiffs did not comply with the regulations under section 2672. First, the notice of claim did not list the individual class members. No class members were specifically named except for Mr. Lareau whose name appeared at the head of the letter indicating the subject matter of the letter. *Lunsford v. United States*, a case applying the regulations, required that the individual claimants be named in a class action. 570 F.2d at 227. *Kantor v. Kahn* adopted this requirement and stated that although the government could have culled the names of the approximately 40,000 claimants from the CAB files, the burden is on the claimant to supply all the information necessary to enable the agency to conduct meaningful settlement negotiations. 463 F.Supp. 1163. *See Luria v. C.A.B.*, 473 F.Supp. at 245 (notice of claim found to be defective because it listed the names of only about half of the purported class). Similarly, the government here could have determined the names of the individuals incarcerated at F.C.I. Danbury. Although the Court sees some distinction between the *Kantor* case and the instant case, the burden is on the claimant to list the individual class members. Strictly construed, plaintiffs did not meet this burden.

Second, plaintiffs failed to comply with 28 C.F.R. § 14.3 which requires that a claim presented by an agent or a legal representative must be accompanied by evidence of his authority to present a claim on behalf of the claimant. This requirement was not met by plaintiffs' counsel's statement that he was bringing suit in the United States District Court "on behalf of all inmates incarcerated at F.C.I. Danbury." In *Luria v. C.A.B.*, previous state class

---

5. In *Blue v. United States*, 567 F.Supp. 394, Walter Tyson's notice failed to state a numerical value for his claim. Nevertheless, the Court found that on the facts of that case, he had in fact "placed a value on his claim". In the instant case, although plaintiffs have included a numerical figure, it fails to "place a value" on the claims of the class members.

certification in a "directly related" case was insufficient to establish that the Lurias were authorized to represent the class described in the notice of claim in a suit against the United States. 473 F.Supp. at 245. In the case at bar, the original class action complaint seeking injunctive relief was filed on April 12, 1979. However, the class was not certified until October 22, 1980, roughly three months after the notice of claim was filed. Thus plaintiffs here cannot even argue that the class certification by this Court vested them with authority to represent the class in bringing an administrative claim under the FTCA because the class had not yet been certified at the time they filed the notice. Furthermore, as the *Luria* court stated:

> Of course a state or federal class action certified within the FTCA period of limitations presents a ready opportunity for the class representatives to identify potential FTCA claimants and the amount of their claims, and to obtain their authorization to file an FTCA administrative claim on their behalf.

Thus, even if the class had been certified before the filing of the notice, the letter does not assert or establish that plaintiffs' attorneys had the specific authorization to act on behalf of the class for the purposes of an FTCA claim. Additionally, in view of the ongoing litigation on the injunctive claim, the class representatives clearly had the opportunity to obtain such authorization. Therefore, plaintiffs failed to comply with 28 C.F.R. § 14.3.

Plaintiffs also failed to provide evidence in support of the claim, as requested by the Bureau of Prisons pursuant to 28 C.F.R. § 14.4 in its letter of February 13, 1981. Plaintiffs clearly did not comply with this requirement and, in fact, argue that they were entitled to disregard the request for further information. Thus, in this regard, plaintiffs failed to satisfy both the regulations and the second prong of the *Keene* test.

Based on the foregoing it is apparent that plaintiffs failed to comply with the regulations. Since the Court has determined that plaintiffs failed to satisfy the jurisdictional requirements as set forth in *Keene*, the Court need not decide whether the failure to satisfy the regulations renders plaintiffs' notice of claim fatally defective. The Court, however, does view plaintiffs' failure to comply with the regulations as exemplifying a lack of interest, for whatever reason, in fully presenting the matter to the Bureau of Prisons before filing suit in federal court.

Plaintiffs also rely on the fact that the allegations in their administrative claim are identical to the allegations in their Second Claim for Relief in plaintiffs' Amended Complaint and cite *Kelley v. United States*, 568 F.2d 259, 268 (2d Cir.1977) in support of this argument. The Court finds this argument meritless and unpersuasive in light of the statutory purpose underlying the requirement that a notice of claim be filed in FTCA actions. Obviously, filing suit in the United States District Court is quite distinct from bringing an administrative claim under the FTCA against a government agency. Further, although *Kelley* may have implied that failure to file a Notice of Claim might not constitute a jurisdictional defect, the Second Circuit has since ruled that "the requirement that a notice of claim be filed is jurisdictional and cannot be waived." *Keene*, 700 F.2d at 841. *See Kantor v. Kahn*, 463 F.2d at 1161 n. 4 (distinguishing the facts of *Kelley*). Given the unique circumstances of the *Kelley* case, that case is of no avail to plaintiffs here.

The Court recognizes the burden this ruling places upon those who endeavor to bring a class action under the FTCA. However, as the Second Circuit stated in *Keene Corp. v. United States:* "The FTCA does not authorize us to balance relative means or relative hardships but places the burden on the claimant to provide sufficient details of the claim made against the government." 700 F.2d at 842.

Dismissal of plaintiffs' FTCA claim comports with the legislative intent underlying the statute. The purpose of the statute was "not to make recovery from the

Government technically more difficult ... [but] to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against it." *Executive Jet Aviation, Inc. v. United States*, 507 F.2d 508, 515 (6th Cir.1974). The papers submitted with regard to this motion, indicate a lack of cooperation with the Bureau of Prisons in its effort to determine whether to litigate or to settle the claim. Further, the statutory requirements would be meaningless if plaintiffs' letter including their unsupported claim for $10,000,000 in damages, was considered to "provide sufficient information both to permit an investigation and to estimate the claim's worth" so that "the government may investigate, evaluate and consider settlement of the claim." *Keene v. United States*, 700 F.2d at 842. Plaintiffs' assertion that it appeared " 'unlikely that the government would have wished to settle this large and factually unusual claim,' " *Executive Jet Aviation v. United States*, 507 F.2d at 515, may or may not be factually correct and, in any event, is not a determination to be made by plaintiffs, but rather, it is a determination to be made by the Bureau of Prisons.

The FTCA constitutes a waiver of sovereign immunity. Where, as here, the conditions by which the United States has consented to be sued are not met, subject matter jurisdiction is lacking. Thus, based on the foregoing discussion, the defendants' motion to dismiss is GRANTED and the claims brought by the plaintiffs pursuant to the FTCA are hereby DISMISSED pursuant to Rule 12(b)(1) for lack of jurisdiction since plaintiffs failed to comply with the statutory requirements of 28 U.S.C. § 2675.

This ruling concludes the litigation in this matter with the exception of attorneys' fees which will be treated as a collateral matter. Judgment shall enter accordingly.

It Is So Ordered.